# Illinois Official Reports

## Appellate Court

---

**M.D. v. Department of Children & Family Services, 2015 IL App (1st) 133901**

---

| | |
|---|---|
| Appellate Court Caption | M.D., Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES and BOBBIE GREGG, Director of Children and Family Services, Defendant-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-3901 |
| Filed | June 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-22419; the Hon. Neil Cohen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Helene M. Snyder, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff M.D. appeals an order of the circuit court of Cook County affirming a final administrative decision of the Illinois Department of Children and Family Services (the DCFS), denying his request to expunge an indicated finding[1] of sexual abuse involving his five-year-old daughter, A.D. On appeal, M.D. contends that the DCFS's determination to indicate was based on a superficial investigation that failed to comply with its own procedures. In addition, M.D. argues that the agency's ultimate determination not to expunge the indicated finding was against the manifest weight of the evidence where the testimony against him was not credible and the scientific evidence refuted the sexual abuse allegations. We affirm.

¶ 2                                    BACKGROUND

¶ 3    On April 2, 2010, the DCFS received a report of the possible sexual abuse of A.D. by M.D. The matter was investigated by both the DCFS and the Wilmette Police Department. That same day, a DCFS investigator interviewed M.D. and his wife N.G. regarding these allegations. Following an investigation, on June 2, 2010, the DCFS issued a finding, based on a "credible evidence" standard, indicating M.D. for allegation 19, sexual penetration, and allegation 21, sexual molestation. Allegation 19 defined "sexual penetration" as follows:

> "Any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or any animal or object into the sex organ or anus of another person. This includes acts commonly known as oral sex (cunnilingus, fellatio), anal penetration, coition, coitus, and copulation." 89 Ill. Adm. Code 300.Appendix B (Allegation 19), amended at 25 Ill. Reg. 12781, 12797 (eff. Oct. 1, 2001).

Allegation 21 defined "sexual molestation" as follows:

> "Sexual conduct with a child when such contact, touching or interaction is used for arousal or gratification of sexual needs or desires. Parts of the body, as used in the examples below, refer to the parts of the body described in the definition of sexual conduct found in the Illinois Criminal Sexual Assault Act [(720 ILCS 5/12-12)] as quoted above under Allegation 18, Sexually Transmitted Diseases. Examples include, but are not limited to:
>
> – fondling.
>
> – the alleged perpetrator inappropriately touching or pinching parts of the child's body generally associated with sexual activity.

---

[1]In accordance with the Abused and Neglected Child Reporting Act (Act) (discussed further herein), the DCFS maintains "a central register of all cases of suspected child abuse or neglect." 325 ILCS 5/7.7 (West 2012). "An entry in the registry is an 'indicated finding' and requires certain procedures set out in the Act and the DCFS rules." *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643, ¶ 29. "A person who is subject to an indicated report may request that DCFS amend the record of the report or remove the record of the report from the State Central Register." *Tiller v. Department of Children & Family Services*, 2013 IL App (4th) 120504, ¶ 31; 325 ILCS 5/7.16 (West 2012).

– encouraging, forcing, or permitting the child to touch parts of the alleged perpetrator's body normally associated with sexual activity." 89 Ill. Adm. Code 300.Appendix B (Allegation 21), amended at 25 Ill. Reg. 12781 (eff. Oct. 1, 2001).

In addition, "[s]exual conduct is defined in the Act as 'any intentional or knowing touching or fondling of the victim or the perpetrator, either directly or through clothing of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child … for the purpose of sexual gratification or arousal of the victim or the accused.' " 89 Ill. Adm. Code 300.Appendix B (Allegation 18), amended at 25 Ill. Reg. 12781 (eff. Oct. 1, 2001).

¶ 4      On June 5, 2010, M.D. requested a timely administrative appeal of the indicated finding.

¶ 5                                              Hearing

¶ 6      The DCFS administrative law judge (ALJ) conducted a hearing beginning April 21, 2011. The matter was continued for further hearing to April 22, June 29, August 29, September 22, September 29, September 30, December 5 of 2011, and February 9 and February 16 of 2012. The DCFS called the following witnesses: (1) Tamara Newel (Newel), psychotherapist for NorthShore University HealthSystems; (2) Scott Peterson (Peterson), child protection investigator for the DCFS; (3) Christine DiGangi (DiGangi), forensic interviewer; (4) Susan Kick (Kick), principal of A.D.'s elementary school; (5) Sousan Bahavar (Bahavar), child protection investigator supervisor at the DCFS; and (6) Glenda Monterey (Monterey), therapist for the Center of Contextual Change. M.D. called the following witnesses to testify at the hearing: (1) N.G.; (2) V.D., mother of M.D.; (3) Kelly Lawrence (Lawrence), forensic scientist from the Northern Illinois Regional Crime Laboratory; (4) Eric Ostrov (Ostrov), forensic psychologist; and (5) M.D.

¶ 7                                          Tamara Newel

¶ 8      Newel testified she is a psychotherapist[2] for NorthShore University HealthSystems. Newel started seeing A.D. for family therapy in 2008. On April 2, 2010, Newel met with A.D. and N.G. A.D. disclosed to Newel that M.D. had "touched and tickled her private parts." A.D. also informed Newel that M.D. made her touch his penis. A.D. further disclosed that her father told her when she wakes up in the middle of the night to come down to the basement and sleep with him, but not to tell anyone.

¶ 9      On cross-examination, Newel testified that it was clinically appropriate to take A.D.'s statement about the suspected abuse in the presence of N.G. because "it was difficult for [A.D.] to tell anyone that" and "[s]he had never been in a session alone with me." Newel further testified that after the disclosure, A.D. played and "laughed a lot." This behavior was not inconsistent with the disclosure because A.D. "appeared to be relieved" after expressing what had been a secret. Newel also testified that A.D. did not disclose that her father "urinated on her," "ejaculated on her," "inserted a pencil into her," or "inserted a stick into her."

---

[2]When asked her "position," Newel responded, "I'm a psychotherapist, a clinical social worker."

¶ 10                                                    Scott Peterson

¶ 11       Peterson testified he is an investigator with the DCFS. On April 2, 2010, the DCFS hotline received a report of sexual abuse regarding A.D. That same day, Peterson interviewed M.D. at his home regarding the allegations that "he had touched his daughter inappropriately, tickled her on her privates, made her touch his penis, and I believe the verbiage was he peed on her." M.D. denied the allegations and indicated he felt they were a result of "nasty divorce proceedings."

¶ 12       Peterson next interviewed N.G., who told him that "her daughter came to her and stated that [M.D.] had touched her inappropriately, that he had tickled her, particularly that he had tickled her privates, that he made her touch his penis and that he went to the bathroom on her." Peterson then implemented a "safety plan" which involved M.D. leaving the home. After M.D. said goodbye to A.D. and exited the residence, Peterson observed A.D. wave at the door and say " 'goodbye, nasty daddy.' "

¶ 13       On cross-examination, Peterson testified that A.D. did not appear to be afraid of her father. He further testified that M.D. told A.D. he was going to go live at grandma's house for a long time. A.D. asked M.D. why he was going away. Peterson testified that M.D. replied that he was going away because "either that somebody had hurt her or it could have been that he did something to her."

¶ 14                                                    Christine DiGangi

¶ 15       DiGangi, a licensed clinical social worker, testified that she has been a forensic interviewer with The Children's Advocacy Center of North and Northwest Cook County (Center) since 2007. She has a master's degree in social work from Loyola University. By the time she interviewed A.D., she had as a forensic interviewer conducted 417 interviews.

¶ 16       DiGangi testified to the protocol for interviewing children in the course of a child sexual abuse investigation. She employs the "Step-Wise" method for interviewing children, which is "a nine-step protocol that entails rapport building, recall the neutral event, truth and lie, introducing the topic of concern, open-ended questions, more narrow-ended questions, use of aids, if necessary, and a conclusion." These interviewing techniques vary depending on the age of the child. For example, when interviewing very young children some of the steps may be condensed.

¶ 17       On April 8, 2010, DiGangi met with A.D. at the Center for a forensic interview. Prior to the interview DiGangi was familiar with the allegations against M.D., that "dad had tickled her privates and that she had to touch his private." DiGangi walked with A.D. back to the interview room, where the two of them were alone. The investigative team, which included two Wilmette police officers, a DCFS worker, and an assistant State's Attorney, was behind a one-way mirror. Following the protocol, DiGangi built a rapport with A.D. by asking her what she would like to be called, her age, what she did for her birthday, where she lives, who lives with her, and about her school. DiGangi then discussed the interview process with her. DiGangi informed A.D. that she was going to ask her questions and if she did not understand the questions to let her know.

¶ 18       DiGangi stressed the importance of telling the truth and asked A.D. if she knew what it meant to be truthful. A.D. replied, " 'no not so much.' " DiGangi then provided A.D. with several examples and asked her to identify in each whether it was telling the truth or telling a

lie. For example, DiGangi asked A.D. "if it would be telling the truth or telling a lie to state that it was currently raining in the interview room and she told me a lie 'because it's not raining.' " She also asked A.D. whether it would be telling the truth or telling a lie to state that her name is A.D. and A.D. responded that it is the truth "because [A.D.] is my name." DiGangi then asked A.D. if she would be truthful and talk to DiGangi about "things that really happened." A.D. responded, " 'I will, I will. I promise you I will.' " At this point, DiGangi believed A.D. was capable of telling the difference between the truth and a lie.

¶ 19 DiGangi then asked A.D. if she knew why she was at the Center. A.D. said " 'because my dad was hurting me.' " DiGangi asked what her father was doing to hurt her and A.D. said, " 'he was touching in my private part and he was doing things he shouldn't do and he told me not to tell anyone and he made me touch his private part. And one time he went potty on me.' " DiGangi inquired as to what private parts her father had touched and A.D. "pointed to her butt and her vagina, and she stated he touched both." DiGangi asked where she was when her father touched her private parts and A.D. replied that she was in his bed. DiGangi then asked A.D. where her father's bed was and she said downstairs. DiGangi inquired as to how A.D. got downstairs and she replied, " 'we have staircases, silly you.' " A.D. told DiGangi that she knew how to go downstairs because her father told her to and that he asked her do to that " 'because he wanted to hurt me.' "

¶ 20 Once downstairs, A.D. would get into her father's bed. When asked if her father was awake or asleep, A.D. replied, " 'he is always awake, working, working, working.' " A.D. told DiGangi that before she got in the bed " '[her father] said get out.' " DiGangi inquired as to whether A.D. stayed in the bed or got out of the bed after she was told to "get out" and A.D. responded that she stayed in the bed. DiGangi asked A.D. what happened next and "at this time she began to shut down and she told me that that was about it, she didn't want to talk anymore, she was getting tired." DiGangi, however, continued to ask A.D. what happened after she got into the bed. A.D. informed her that "that's when daddy would do the bad things, the touching." A.D. told DiGangi that when her father was touching her private parts, "he would laugh and that he would say 'I'm touching [A.D.'s] private parts.' "

¶ 21 Regarding what she was wearing, A.D. stated she was not wearing anything when she got into her father's bed and that she " 'usually [does not] wear anything late at night' "; however, she also said that her father told her to take her pajamas off and put them in the laundry. A.D. told DiGangi that her father touched her private parts on her skin, not through her clothes.

¶ 22 A.D. told DiGangi that her father "touched her on the inside and she said one time he touched the hole where the pee comes out and it really hurt." When asked how she knew it went inside, A.D. said " 'because I could feel it.' " When asked what private part her father touched, A.D. pointed to her vagina. A.D. further explained her father touched her with his fingers and a "pencil" or "pencil stick." A.D. described the "pencil stick" as "big and thick and pointy." DiGangi testified, "I asked her where her dad got the stick from, and she told me outside." When asked how many times her father "touched her front private part," A.D. told DiGangi "a hundred." A.D. told her that she was three years old when her father first started touching her and he last touched her, " 'Monday, last Monday, a few Mondays ago.' "

¶ 23 DiGangi asked A.D. if she had touched her father's "private part" and if "that's when the pee came out" and A.D. responded, "yes, yes, yes." When asked what the "pee" looked like, A.D. told DiGangi "it was orange and that it went on her hand." Thereafter, A.D. washed her hand and changed from her "kitty cat pajamas" into a nightgown "because dad peed on me."

A.D. then put the pajamas in the laundry. DiGangi asked A.D. how many times her father had peed on her, and she replied "a hundred."

¶ 24    DiGangi asked A.D. how she knew to touch her father "on the skin" and A.D. said " 'because he was touching my private part and he holded [*sic*]–he grabbed my hand.' " DiGangi testified:

> "At this time [A.D.] grabbed her wrist and showed me by grabbing her wrist.
>
> And she said that he would put it in there.
>
> I asked her what she would have to do once her hand was by her dad's private part. And she said 'like this' and she held up her hand and made a fist in the interview room.
>
> I asked her if her hand stayed still or moved around. And she said 'still.' And, again, she made the fist and said 'like this.' "

DiGangi asked A.D. what her father's private part looked like:

> "[S]he told me that 'it was big and it squished around.' I asked her if it was standing up or lying down. And she said it was standing up.
>
> She also added something about 'when daddy's private part is standing up is when he is happy–or when he is happy his private part stands up.'
>
> I asked her who told her that, and she said 'dad did.' "

According to A.D. her father told her, " 'don't tell your mom, don't tell your mom I did this, but I did [tell mom] because I didn't care."

¶ 25    DiGangi then gave A.D. a 15-minute break from the interview and went to confer with the investigative team to see if they needed her to ask A.D. any more questions. DiGangi then resumed the interview and asked A.D. "what she calls the downstairs where dad's bed is and she told me the basement." The basement door would be open and it was dark, even though her father was working. This was because he was working on the computer and it made a light in the basement. DiGangi asked A.D. again if she had no clothes on when she first got into her father's bed and A.D. said yes. DiGangi further testified:

> "[S]he told me that she had to be in the bed and that dad peed on them and that she took them off and that she had to go upstairs to get a nightgown on and that she came back downstairs to see if dad would take them off and do the touching.
>
> And then I asked–I asked her if she ever sleeps with mom, and she said 'not that much.' And I asked her if she has clothes on when she sleeps with mom, and she said 'yes, I have clothes when I sleep with mom.' "

DiGangi asked A.D. again if she was wearing clothes when she first got into her father's bed and, "[A.D.] told me that her pajamas are on and that she takes them off–that she takes them off and she puts new pajamas on and then dad takes her new pajamas off and does the touching. *** I believe she took off her pajamas because she stated that her dad had peed on her." A.D. told DiGangi that when she went to see her mother, she was wearing "noodle straps and underwear." When asked why she decided to tell about her father touching her, "[A.D.] said that she had to. She told me this was the first time that she was telling."

¶ 26    When asked if her father had ever touched his private part to her private part, A.D. responded, "yes" and that "it was bad." According to A.D., "he slapped her private part with his private part or he hit his private part about her private part. *** She told me it felt yucky. I asked her if it hurt, tickled, or something else. And she told me it tickled." When she asked

- 6 -

A.D. if she was standing, sitting, or lying down when her father put his private part in her private part, DiGangi testified:

"At first [A.D.] said that she was lying down and then she said standing. She told me that they were both standing. And I told her I was confused as to how her dad was able to touch her private part with his private part if they were standing.

And then she told me that they were kneeling. And she showed me in the interview room by kneeling down on [*sic*] the interview room.

* * *

She told me that she was standing and that he was able to put his private part in the circle because she was standing close."

¶ 27    DiGangi testified she did not observe any signs that A.D. had been coached. According to DiGangi:

"A lot of times [children who are coached] are not able to give peripheral details. They come in and keep repeating a blanket statement over and over again.

[A.D.], however, was able to provide details that another five-year-old child wouldn't know. And she was able to provide a great amount of detail, actually nine single-spaced pages of detail."

Additionally, A.D. answered her questions directly and used age appropriate language. According to DiGangi, "[A.D.] has knowledge of sexual–of things of a sexual nature that an average five year old without experiencing this would be able to relate." DiGangi's report of her interview with A.D. was then entered into evidence without objection.

¶ 28    On cross-examination, DiGangi testified that the interview was not recorded despite a policy implemented in 2009 to digitally record the forensic interviews of children. This was because the protocol was in place before the recording equipment was provided and the funds for the Northbrook office had not come through as of April 2010 when A.D. was interviewed. Accordingly, DiGangi took copious notes of her interview with A.D.

¶ 29    DiGangi further testified that A.D. "presented as a distracted child" because she had told DiGangi at times that she did not want to talk anymore or that she was tired. But, according to DiGangi, A.D. made these statements "because she didn't want to talk about what we were talking about." A.D. was not frightened during the interview, even when talking about the touching and the urination. A.D. did, however, appear anxious when DiGangi got close to the subject matter of the touching, but when A.D. actually spoke of the touching and penetration, she was "fine."

¶ 30    DiGangi acknowledged that A.D. indicated that when her father touched his private part to her private part she changed her answer from lying down to standing to kneeling. DiGangi clarified that A.D. told her both of them were kneeling. When asked whether she believed if penetration was physically possible in this position, DiGangi responded, "Anything is physically possible."

¶ 31    Regarding what A.D. was wearing, DiGangi clarified A.D. told her she was not wearing anything when she got into bed with her father, then after her father peed on her hand she had to change into different pajamas. Then she changed her pajamas after going up stairs. Then A.D. went downstairs to see if her father would take her pajamas off.

¶ 32    A.D. told DiGangi that she was abused by her father when she was three, but that the abuse did not occur when she was living in Chicago. A.D., however, was three years old when she

was living in Chicago.

¶ 33                                Susan Kick

¶ 34        Kick is the principal of A.D.'s elementary school and first became familiar with A.D. when she entered kindergarten in 2008. In kindergarten and first grade, A.D. had "some assistance with the social worker" and a learning behavior specialist, Kate Cummings (Cummings). Kick first learned of the alleged sexual abuse on April 12, 2010, from Emily Nuzzo (Nuzzo), a social work intern. After speaking with Nuzzo, Kick determined that "we needed to talk to [A.D.] further, clarify what she had said and then determine if we needed to call DCFS."

¶ 35        A.D. was brought to Kick's office where she met with Kick, Nuzzo, and Cummings. A.D. told Kick that her father had been touching her. Kick asked:

> "like on your arm, like this or on your leg. She said no, here. And I said where is here. And she pointed to her genitals and said he pulls and pulls and tugs and tugs and it hurts.
>
> * * *
>
> I then asked if it had been–if it happened one time, more than one time. And she said lots and lots of times. It's really bad, bad, bad, bad, bad.
>
> And at that point I determined we had enough information to call DCFS for them to finish the investigation."

Kick did not observe any signs that A.D. had rehearsed the story. According to Kick, "it seemed like a very impromptu conversation, nothing that was rehearsed."

¶ 36        On cross-examination, Kick indicated A.D. was seeing Nuzzo because she had "some transition difficulties in kindergarten" such as being "distractible, inattentive, might cry. She might not want to do a task, and she might like scream or throw herself on the ground like having a tantrum."

¶ 37                              Sousan Bahavar

¶ 38        Bahavar is a child protection manager at the DCFS. She has worked for the DCFS for 26½ years, has two master's degrees, and is a licensed clinical social worker. In 2010, she was supervising Leslie Goldberg-Mobry (Goldberg-Mobry), the lead investigator regarding this matter. Goldberg-Mobry, however, was unavailable to testify during the hearing. Accordingly, Bahavar testified regarding the investigation in her stead.

¶ 39        Bahavar testified to the following. On April 2, 2010, the DCFS hotline was contacted regarding allegations that M.D. had molested his five-year-old daughter. On April 8, 2010, Goldberg-Mobry was present during A.D.'s forensic interview. After the forensic interview, Goldberg-Mobry attended a poststaffing meeting where she met with all the individuals who attended the interview and discussed whether A.D. was credible. The conclusion drawn at the meeting was that A.D. "presented to be very credible."

¶ 40        On May 3, 2010, Goldberg-Mobry interviewed M.D., as indicated in her case notes, which were entered into evidence as part of the DCFS investigative file. In the course of her investigation Goldberg-Mobry also interviewed N.G., N.G.'s counsel, Newel, Kick, Terry Smith, the court-appointed child custody evaluator, Glenda Rogers, and others.

¶ 41        Bahavar testified regarding A.D.'s medical examination that was conducted by Dr. Afsoon Karimi and entered into evidence as part of the DCFS investigative file. The report indicated

that Dr. Karimi found no medical evidence of sexual abuse and concluded that A.D.'s examination was "normal." The report, however, included that A.D. had been experiencing genital pain on and off for the last two years and the pain had recently become more frequent. Dr. Karimi wrote in her report that, "A normal genital/anal exam does not rule out any past *** child sexual abuse. It is very common to have normal genital/anal exam in cases of child sexual abuse." Bahavar also testified that, "the result of a normal exam does not substantiate that there was no sexual abuse."

¶ 42    Regarding her final meeting with Goldberg-Mobry, Bahavar testified they determined that A.D. was "very credible":

> "[A.D.] provided detailed information. She was consistent. She presented age appropriate language. She did not present to be coached. She was detailed in regards of the event, how did it take place, how it felt to the child, and what took place before and after and where was she and where was the father."

Based on its investigation, the DCFS then determined it would indicate a finding of allegation 19, sexual penetration, and allegation 21, sexual molestation, against M.D.

¶ 43    On cross-examination, Bahavar testified that there were no inconsistencies between A.D.'s disclosure to Newel and her statements to DiGangi at the forensic interview. Bahavar explained that full disclosure of the abuse occurs at the forensic interview when the child is interviewed in detail with questions for which he or she is not prepared. According to Bahavar, "Therefore, we always see there is more disclosure either way in the forensic interview than what somebody else reports the child has told them." In addition, Bahavar stated that "the initial disclosure should not be explored further because the child is going to be interviewed in forensic interview and all the professionals are trained on that."

¶ 44    When questioned regarding A.D.'s statement that M.D. told her to "get out" prior to the sexual assault, Bahavar testified, "Just because a person tells the child to get out doesn't mean he did not touch her later or five-minutes later or an hour later or two minutes later. It's two separate things."

¶ 45    Regarding A.D.'s positioning in relation to her father during the alleged abuse, Bahavar found A.D.'s statements to be credible because the abuse happened "more than once." Bahavar testified A.D. was recalling multiple occasions of abuse "because she said she was touched [a] hundred times. She didn't say she was touched only March 29th." When asked if it "seemed possible to you that an adult man could touch his private part to that of a five-year-old girl if she is standing and he is lying down," Bahavar responded, "If she is standing and he is lying down, yeah. *** He is laying [sic] down in the bed." When asked, "Does it seem possible to you that an adult man can touch his private part to that of a five-year-old girl if she is standing and he is standing," Bahavar replied, "I have never seen the child and I don't know how tall she is. But anything is possible." Bahavar further testified that the DCFS criteria for sexual penetration does not have to be "full penetration," but can be contact "however slight."

¶ 46                                    Glenda Monterey

¶ 47    Monterey testified as follows. She has a master's degree in marriage and family therapy and has been employed as therapist with the Center for Contextual Change since July of 2006. Monterey met with A.D. on a weekly basis beginning May 11, 2010, for trauma-focused cognitive behavioral therapy. Such therapy is an "evidence-based treatment model for kids age

3 to 18 who have symptoms of trauma" and "consists of different components that help them build coping skills and create safety so that they can talk about their trauma experience."

¶ 48    During A.D.'s first session, Monterey asked A.D. why she came to see her, and A.D. replied that she was there because her dad hurt her. Throughout the session A.D. continued to "present with a lot of trauma symptoms, and anxiety and hyperarousal, and seemed to get easily overwhelmed and flooded." It was during their third session that A.D. disclosed to Monterey that "dad touched her private parts in a bad way."

¶ 49    In sessions thereafter, A.D. expressed concerns over her safety and a fear of encountering her father in public spaces. According to Monterey, "[A.D.] asked a lot of questions about the scenarios and would imagine every possible thing that could happen." A.D. would say things like, "What if dad follows us, what if we see him again, what if mom can't protect me, what if he wears a disguise." In one particular session, A.D. played a game with puppets wherein the larger turtle bit the smaller turtle. A.D. then got other puppets and had them eat the big turtle, then she comforted the little turtle. Monterey asked A.D. what the little turtle needed to feel safe and she said "not to see the big turtle." Monterey then asked A.D. whether she wanted to see her father and A.D. said " 'no, because he put his finger on my private part.' " Monterey recalled that A.D. was "anxious and agitated, hyperaroused" and, after making this disclosure, had encopresis, an involuntary bowel movement.

¶ 50    In sessions that followed, A.D. continued to worry that her father would hurt her again. Monterey had A.D. draw a picture of the fear that she had in one of her nightmares. A.D. "drew a picture of her dad and of herself. And she drew a penis on her dad and she drew an arrow connecting his penis to her private part and said that her dad put his private on her private. *** She circled her vaginal area and then drew an arrow coming out of her dad's penis and directing to her vaginal area."

¶ 51    Monterey testified that during their sessions A.D. has never recanted her allegations against her father nor did Monterey observe any signs that A.D. had been coached. Monterey based this statement on the fact that "[A.D.] has made consistent disclosures across multiple settings. And the disclosures are oftentimes spontaneous. And when she makes the disclosures, her affect is congruent with what she is saying." In addition, when A.D. discusses her father she becomes hyper aroused and anxious. Her "physiological reactivity is high. She is often moving around, kind of rocking. And many times she has had issues with toileting and had to run out of the session to use the bathroom."

¶ 52    On cross-examination, Monterey testified that she has never met or spoken with M.D. She was aware that A.D.'s parents were going through a divorce and discussed the divorce with A.D. Monterey acknowledged that the divorce could be a partial cause for her anxiety. A.D. did not tell her that M.D. "went pee-pee on her," "inserted a pencil stick into her private parts," or "inserted a stick into her private parts." After treating A.D. for 10 months, Monterey acknowledged that A.D. had not made a full disclosure of the traumatic event; however, according to Monterey, "[A.D.] hasn't got to the part of her treatment where I would ask her or even allow her to make a full disclosure." Additionally, Monterey testified that in the past she has stopped A.D. from making a full disclosure to her because, "It's not therapeutic for kids to make disclosures when they are in a state of hyperarousal. It could be retraumatizing for them."

¶ 53    The DCFS then rested and M.D. elicited the following testimony from five witnesses.

¶ 54                                      N.G.

¶ 55        N.G., A.D.'s mother, testified as follows. At the time of her testimony she was still married to M.D., although divorce proceedings were initiated in 2009. In January of 2010, the parties entered into an agreement where M.D. would continue to reside at the marital residence, but he would sleep in the basement.

¶ 56        On the evening of March 29, 2010, N.G. went to a Passover Seder at a friend's home while M.D. watched A.D. N.G. returned home at 11 p.m. and believed A.D. was asleep in her room because her bedroom door was closed. After packing for an upcoming trip to Naperville, Illinois, N.G. went to bed at 1:30 a.m. At 2 a.m. she heard A.D. scream and cry. N.G. started to get out of bed, but before she reached her bedroom door, A.D. came into her bedroom, crying. A.D. was wearing underwear and a white spaghetti strap top. A.D. told N.G., "Mommy, daddy is tickling my private parts and it makes me feel bad." N.G. replied, "Honey, I'm sorry. I bet that makes you feel bad. I'm glad you told mommy." N.G. further testified:

> "And we were quiet awhile. And I asked her, 'Were you sleeping downstairs in the basement with daddy?' And she said, 'Yes. But he touches and rubs me and I don't like that. It feels weird.'
>
> And we were quiet for a while longer. And she said, 'Daddy puts his hand on my penis [*sic*] and it feels funny when I do that and he even peepeed [*sic*] on me.' "

At the time, N.G. did not examine A.D. or her pajamas for signs of semen or urine. Although she routinely washed A.D.'s clothing, N.G. had not previously observed signs of semen on A.D.'s clothing because she was not looking for it.

¶ 57        The next day, A.D. was very anxious and "seemed off." N.G. did not confront M.D. because he had left for work by the time she woke up. N.G. had volunteered to make a meal for the mother of one of A.D.'s classmates who was ill. She and A.D. went grocery shopping, made the meal, and delivered it at 4 p.m. N.G. then drove A.D. from the classmate's home to a hotel in Naperville for their preplanned spring break vacation. N.G. did not notify anyone about the sexual abuse at that time because A.D. was with her the entire day and "it wasn't something that I wanted to talk about in front of her." N.G. further testified she was "in shock" and knew that if she continued with the scheduled trip to Naperville it would keep A.D. safe and away from M.D. N.G. did not initiate any further conversations with A.D. about the abuse while they were on their trip, but A.D. did bring it up "numerous times."

¶ 58        On Thursday, April 1, 2010, N.G. contacted Newel to schedule an appointment for her to see A.D. At 2:30 p.m. the next day, Newel met with N.G. and A.D. Thereafter, Newel informed N.G. that she would be contacting the DCFS. N.G. then returned home with A.D. at 4:30 p.m. for the first time since March 30. M.D. arrived home at 5 p.m. N.G. observed A.D.'s reaction to his arrival. According to N.G., A.D. was "really, really kind of anxious and hyper, nervous." Within an hour Peterson, an investigator from the DCFS, came to her home and asked to speak with M.D. N.G. took A.D. upstairs with her while Peterson interviewed M.D. After Peterson spoke to M.D., he interviewed N.G. while A.D. continued playing upstairs. N.G. told Peterson what A.D. had said to her and denied that these allegations against M.D. were related to their divorce proceedings. Meanwhile, M.D. was in the basement gathering his belongings. When M.D. said goodbye to A.D., N.G. could not see them but could hear them. N.G. heard A.D. say, " 'goodbye, nasty daddy' " after M.D. closed the backdoor behind him.

¶ 59    On April 8, 2010, a Wilmette police officer came to her home and asked N.G. to gather some of A.D.'s clothes. Some of the clothing came from the luggage she brought on the trip to Naperville and other clothes came from A.D.'s dirty laundry bin. N.G., however, also indicated that she had done laundry after she had returned from Naperville.

¶ 60    N.G. further testified that it was not a "normal thing" for A.D. to go to bed without wearing underwear; however, N.G. had previously taken A.D. to the pediatrician because A.D. had complained of vaginal irritation. The pediatrician recommended that she sleep without underwear. A.D. slept without underwear one or two times after that. In addition, on one occasion N.G. observed A.D. sitting on the couch next to M.D. without underwear on.

¶ 61    N.G. denied that A.D. had behavioral problems; however, there was an extra aide in A.D.'s preschool classroom because there were several children who needed extra assistance.

¶ 62    On cross-examination, N.G. testified that after A.D. attended the forensic interview, she continued to disclose details of the abuse. A.D. told N.G. that M.D. had penetrated her vaginally and repeated that he "peepeed on her." A.D. also "asked repeatedly why, why did daddy do this to me. She has been terrified that he would find a way back into the house or her school and hurt her again." A.D. had anxiety that was preventing her from falling asleep. When she did fall asleep, A.D. had nightmares about the abuse and would wake up screaming. She also reverted to bedwetting, which she had not done since she was three years old. N.G. further testified that A.D. continues to receive individual therapy and is doing better. According to N.G., since M.D. has vacated the marital residence A.D. has "totally blossomed and come alive" and is "a lot calmer" and happier.

¶ 63                                    V.D.

¶ 64    V.D. testified that she is M.D.'s mother and A.D.'s grandmother. She has known A.D. since she was born and visited A.D. regularly and on holidays, but has not seen A.D. since April 2010. V.D. further testified that M.D. was A.D.'s primary caretaker after she was born, as N.G. had many health issues and was unable to care for A.D. In the beginning of 2010, V.D. observed N.G. begin to take more care of A.D. In the weeks prior to the March 29, 2010, incident, V.D. observed M.D. with A.D. and that their interaction was "normal." V.D. was "shocked" to learn that M.D. was under investigation for sexual abuse of A.D. She wrote a six-page letter to Goldberg-Mobry attesting to her son's good character and ability to parent A.D. V.D.'s letter, along with other character reference letters on behalf of M.D., had previously been entered into evidence as part of the DCFS investigative file.

¶ 65                              Kelly Lawrence

¶ 66    Kelly Lawrence, a forensic scientist at the Northeastern Illinois Regional Crime Laboratory, testified that she tested the clothing retrieved from A.D.'s home on April 8, 2010. Lawrence received three pairs of underwear, two tank tops, one pajama top, and one pair of purple pajama bottoms with hearts. Lawrence first tested the clothing to locate any biological fluid stains, such as urine or semen, using the alternative light source (ALS) method. All of the items, except for the pajama top and the pajama bottom, tested ALS positive. Lawrence then conducted an acid phosphatase (AP) test, a presumptive test for seminal fluid, on the clothing that tested ALS positive. Out of all the clothing that tested ALS positive, only two pairs of underwear tested AP positive. After conducting a prostate specific antigen test and microscopic test on the two pairs of underwear, Lawrence determined that no seminal fluid or

sperm was present. Lawrence testified that to a reasonable degree of scientific certainty there was no seminal fluid on any of the clothing tested. No DNA testing of the garments was performed.

¶ 67    Lawrence also did not test the clothing further to determine whether the biological stains were urine. According to Lawrence, if she had tested for urine it would have been nonproductive, because if the stain was positive for urine she would have been unable to identify whose urine it was due to the fact that urine does not contain DNA. At the conclusion of her testimony, Lawrence's forensic report was entered into evidence.

¶ 68                                    Eric Ostrov

¶ 69    Ostrov testified that he is a board-certified forensic psychologist and has been practicing since 1981. According to Ostrov, forensic psychology is "psychology applied to legal issues." His primary area of expertise is regarding whether law enforcement personnel are fit for duty; however, he has worked with children when conducting child custody evaluations in divorce proceedings 4 to 5 times a year for the past 30 years. Of those evaluations, Ostrov testified that 10% to 15% of them involved children who were age five or younger. Ostrov has never evaluated a child under the age of five in reference to a criminal proceeding.

¶ 70    Ostrov testified that he reviewed the forensic interview conducted by DiGangi and the DCFS records provided to him by M.D.'s counsel. Ostrov opined that the forensic interview did not meet the standards for eliciting accurate information as it was not conducted in a proper manner. Specifically, DiGangi did not properly inquire whether A.D. knew the difference between the truth and a lie, asked leading questions, and failed to ask pertinent follow-up questions.

¶ 71    Regarding DiGangi's questioning of A.D. about the difference between the truth and a lie, Ostrov testified that DiGangi did not inquire as to whether A.D. understood that people can make up stories. Ostrov explained that the interviewer should make clear to the child that the interviewer does not want the child to try to guess what the interviewer wants to hear or thinks is true, but that the child should be telling to the best of her recall what actually did happen in every circumstance and underline to the child how important it is that they say what actually happened.

¶ 72    Ostrov further testified that leading questions are problematic for children because they tend to believe adults know the right answer and if you provide them with indirect information, they will tend to believe that information. Ostrov defined a leading question as "a question that provides information indirectly to the recipient of the question." In Ostrov's opinion, DiGangi asked A.D. leading questions. Specifically, DiGangi asked "when her dad touches you on your skin, does he touch you any place else?" Ostrov explained this question is leading because DiGangi is suggesting to A.D. that M.D. touched her somewhere else. Another example was when DiGangi asked A.D. whether M.D. "ever touched his private to hers and asked her whether he ever touched her inside." This was a leading question because she is conveying to A.D. that M.D. may have touched her somewhere else and may have touched her inside or put his private against her private. Additionally, the question "does he say anything else to you" is leading because DiGangi is suggesting to the child that M.D. said something else.

¶ 73    Ostrov further opined that DiGangi erred in questioning A.D. by not asking follow-up questions after A.D. disclosed that her father had urinated on her. Ostrov testified that he would have asked A.D. for details, whether it happened before, what the circumstances were,

where it occurred, and what M.D. said to her about it. Ostrov would have also asked follow-up questions when A.D. stated that her father was working on new ways to hurt her. According to Ostrov, "I would have asked her to tell me all about that, why she said that, what she meant by that, what's the evidence for that. I would have wanted to know all about the question–all about the statement ***." He also would have asked A.D. "if [M.D.] was working all the time, how is he in the bed? Was he working in the bed?" Ostrov would also have asked follow-up questions regarding how A.D. and M.D. were positioned.

¶ 74　　On cross-examination, Ostrov testified he had never met A.D. nor did he observe the forensic interview on April 8, 2010. He also acknowledged that many of DiGangi's questions were open-ended. Ostrov testified he has never conducted a forensic interview like the one conducted by DiGangi and has never been hired by a law enforcement agency to interview a child who has alleged to be a victim of sex abuse. Moreover, Ostrov clarified that it is infrequent that he works with children A.D.'s age and, of those he has worked with, it has been in the context of child custody evaluations.

¶ 75　　On redirect, Ostrov testified that interviewing a child under five year old would not be much different from interviewing a child over five years old if the child is verbal and understands language.

¶ 76　　　　　　　　　　　　　　　　　　　M.D.

¶ 77　　M.D. provided the following testimony. He and N.G. married in 2002. In August of 2004, A.D. was born after a difficult pregnancy due to N.G. having a degenerative disk in her lower spine. Thereafter, M.D. was A.D.'s primary caregiver. In 2006, the family moved to Chicago and M.D. continued to care for A.D. "almost exclusively." In 2008 the family moved to Wilmette, where M.D. maintained the same level of parental responsibility for A.D. In June of 2009, M.D. and N.G. agreed to obtain a divorce. They continued to reside in the same home together with A.D. and in January 2010 entered into an agreement wherein M.D. would reside in the basement of the marital residence and N.G. and A.D. would reside on the second floor. According to M.D., on March 29, 2010, he and N.G. were not on good terms.

¶ 78　　M.D. denied sexually abusing A.D. He acknowledged that A.D. had come to the basement on the night of March 29, 2010, but that he pushed her off of the bed after she began whining when he told her he would not get her a glass of water. Her whining escalated to screaming. N.G. then called for A.D. from the top of the basement stairs and gave her a glass of water. A.D. then went to bed.

¶ 79　　M.D. further testified that when he left the marital residence on April 2, 2010, at Peterson's direction, he told A.D. that he had to leave "because somebody said that I was hurting you." He also testified that A.D. "said she loved me and we gave each other a hug and a kiss."

¶ 80　　In early May of 2010, M.D. was interviewed by Goldberg-Mobry. M.D. denied the allegations. M.D. explained to Goldberg-Mobry that he thought the allegations were related to the divorce proceedings and that he believed N.G. was behind the accusations because she had used the DCFS as a threat in the past if he ever were to divorce her. He acknowledged, however, that it was N.G. who filed for divorce. M.D. asked Goldberg-Mobry what he could do to prove his innocence. Goldberg-Mobry informed him that he could obtain a sex offender evaluation. M.D., however, did not obtain a sex offender evaluation.

¶ 81 M.D. also testified regarding A.D.'s history of behavioral problems. When A.D. was two years old, M.D. and N.G. began seeing a therapist to address issues of discipline and how to handle A.D.'s "acting out." In May of 2008, A.D. began working with an occupational therapist; however A.D. continued "acting out at home more, screaming, hollering *** if she didn't get her way." In fall of 2008, A.D. began attending full-time day care at the Wilmette park district. M.D. and N.G. received a report from the director of the facility regarding A.D.'s behavior. After meeting with the director to address A.D.'s behavioral issues a special assistant was brought in to assist A.D. In fall of 2009, A.D. began kindergarten and attended the park district after-school program. M.D. received reports from her teachers, as well as her after-school care providers, that she was being disruptive. M.D. and N.G. met with the park district director and an aide was assigned to assist A.D. after school.

¶ 82                                        ALJ's Recommendation

¶ 83 After considering all the testimony and evidence, the ALJ determined that the DCFS proved by a preponderance of the evidence that M.D. was a perpetrator of child abuse as defined by the Abused and Neglected Child Reporting Act (the Act) (325 ILCS 5/1 *et seq.* (West 2012)) and allegations 19 and 21, sexual penetration and sexual molestation. The ALJ recommended that the Director deny M.D.'s request for expungement of the indicated findings from the State central register. According to the ALJ:

> "In the matter at hand, despite a physical exam of [A.D.] and a laboratory analysis of [her] clothing, no physical evidence of sexual abuse was discovered, which neither confirms nor denies the sexual abuse had occurred. Further, no eye-witnesses to the events in question exist. While [M.D.] is clearly thought highly of by his friends, family and collogues [*sic*] as evidenced by the numerous letters of support he received, the only individuals who are able to definitively state what occurred on the night of March 29, 2010, are [M.D.] and [A.D.] In the absence of any other exculpatory or inculpatory evidence, the issue before the Administrative Law Judge is reduced to whether the statements of [A.D.] were credible and therefore the sexual abuse at the hands of [M.D.] had, in fact, occurred, substantiating allegations #19 and #21."

¶ 84 The ALJ found A.D.'s statements to be age appropriate and credible and, in contrast, found M.D. not to be credible. Regarding A.D.'s inconsistent statements, the ALJ stated, "It is reasonable to assume a child of five would not relate precisely the same facts to each and every individual she spoke with, particularly if those individuals are not experienced, as Ms. DiGangi is, in interviewing young children who may have been victims of abuse. Indeed, had [A.D.] simply recited the same facts, in the same manner, to everyone she spoke to, that would be more indicative of coaching or coercion." The ALJ found A.D.'s statements to Newell, DiGangi, Kick, and Monterey "extremely consistent in light of her age and development."

¶ 85 Regarding Ostrov's testimony, the ALJ found that his ability to judge A.D.'s credibility was "hampered significantly" as he only had documentary evidence from the DCFS to rely upon to form his opinion. The ALJ further found that Ostrov's expertise did not extend to the field of child development, as his experience with children age five and under was limited and that this limited experience with the interview process of children was evident in his testimony and report.

¶ 86     On May 16, 2012, the Director adopted the specific findings of fact and conclusions of law of the ALJ and denied M.D.'s request for expungement of the record.

¶ 87                              Complaint for Administrative Review

¶ 88     On June 18, 2012, M.D. filed a complaint for administrative review with the circuit court of Cook County. After the matter was fully briefed, the circuit court issued a written opinion affirming the Director's decision. M.D. now appeals from the order of the circuit court.

¶ 89                                          ANALYSIS

¶ 90     On appeal, M.D. asserts the DCFS's determination to indicate was based on a superficial, biased investigation that failed to comply with its own procedures and, thus, was itself clearly erroneous. In addition, M.D. argues that the agency's ultimate determination not to expunge its indicated finding was against the manifest weight of the evidence where: (1) A.D.'s varying accounts of the sexual abuse were not credible; (2) N.G.'s testimony was not credible because she had ample motive to coach A.D.; and (3) the scientific evidence refuted the sexual abuse allegations.

¶ 91                                   Standard of Review

¶ 92     In reviewing a final decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)), we review the administrative agency's decision and not the circuit court's determination. *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010). A reviewing court considers all questions of fact and law presented by the entire record. 735 ILCS 5/3-110 (West 2012). In administrative review cases, this court reviews factual questions under the manifest weight standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Tiller v. Department of Children & Family Services*, 2013 IL App (4th) 120504, ¶ 27. An administrative agency's factual findings are against the manifest weight of the evidence only when the opposite conclusion is clearly evident. *Id.*

¶ 93                     Whether DCFS Conducted an Improper Investigation

¶ 94     M.D. first contends that the agency's determination not to expunge the indicated finding against him must be reversed where the DCFS conducted an improper investigation. Specifically, M.D. argues that the DCFS failed to obtain all the available evidence and did not take into consideration that A.D.'s statements were made in the context of acrimonious divorce proceedings. Additionally, M.D. asserts that Goldberg-Mobry failed to consider the "inconsistent assertions, flights of fancy, contradictions and sheer impossibilities of A.D.'s statements" in her indication of abuse and did not consider the scientific evidence.

¶ 95     In response, the DCFS argues that it is improper for M.D. to challenge the indicated findings where the matter is on appeal from the Director's determination not to expunge those findings. The DCFS asserts that Goldberg-Mobry's decision to indicate was nonfinal because M.D. made a timely filed administrative appeal, and it is the Director who makes the final determination.

¶ 96     The Act requires the DCFS to maintain a central register of all cases of suspected child abuse or neglect reported and maintained under the Act. 325 ILCS 5/7.7 (West 2012). The

DCFS investigates all reports and classifies them as "indicated," "unfounded," or "undetermined." 325 ILCS 5/7.12 (West 2012). A report is "indicated" when an investigation determines that credible evidence of the alleged abuse or neglect exists. 325 ILCS 5/3 (West 2012). Credible evidence of abuse or neglect is found when the available facts, viewed in light of the surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected. 89 Ill. Adm. Code 300.20, amended at 35 Ill. Reg. 1599, 1605 (eff. Jan. 15, 2011).

¶ 97        A subject of an indicated report may request the DCFS to amend the record of the report or to remove the record of the report from the central register. 325 ILCS 5/7.16 (West 2012). If the DCFS refuses a request, the subject of the report has the right to an administrative hearing before an administrative law judge to determine whether the record of the report should be amended or removed. *Id.* The DCFS has the burden of proof in justifying the refusal to amend, expunge, or remove the record, and it must prove that a preponderance of the evidence supports the indicated finding. *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 24. After the hearing, the Director of the DCFS receives the ALJ's recommendation and may accept, reject, amend, or return the recommendation. *Id.* The Director's decision is the final administrative decision. *Id.*

¶ 98        Under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)), an individual may appeal the DCFS's determination in a complaint for administrative review before the circuit court. 325 ILCS 5/7.16 (West 2012). "In reviewing an administrative agency's decision, the reviewing court's role is limited to determining 'whether the findings and decision of the agency are against the manifest weight of the evidence.' " *Montalbano v. Department of Children & Family Services*, 343 Ill. App. 3d 471, 477 (2003) (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)).

¶ 99        We decline to review the DCFS's determination to indicate. As previously discussed, the Director's determination is the final administrative decision, not the DCFS's initial determination to indicate. Thus, on appeal we do not review the propriety of the DCFS's investigation as M.D. argues, but instead may only consider the ultimate decision of the agency. *L.F. v. Department of Children & Family Services*, 2015 IL App (2d) 131037, ¶¶ 45-46 (stating that the DCFS Director's decision to accept, reject, amend, or return the ALJ's recommendation is the "final administrative decision" subject to judicial review); *Shilvock-Cinefro v. Department of Children & Family Services*, 2014 IL App (2d) 130042, ¶¶ 21-22 (same). Accordingly, we decline to review the propriety of the DCFS investigation and turn to consider M.D.'s other argument on appeal that the agency's findings were against the manifest weight of the evidence.

¶ 100                    Whether the Agency's Finding Was Against the Manifest Weight

¶ 101        M.D. argues that the agency's determination not to expunge its finding was against the manifest weight of the evidence where: (1) A.D.'s varying accounts of the sexual abuse were not credible and the record established that A.D.'s statements changed with retelling, were contradictory, and resulted from suggestive questioning by DiGangi; (2) N.G.'s testimony was also not credible, as she had ample motive to fabricate a story of abuse due to their impending divorce; and (3) the scientific evidence refuted the sexual abuse allegations.

¶ 102        In this case, M.D. challenges the findings of fact of the agency. "The findings and conclusions of the administrative agency on questions of fact are held to be prima facie true

and correct." 735 ILCS 5/3-110 (West 2012). A reviewing court is limited to determining whether the agency's findings of fact are against the manifest weight of the evidence. *Slater*, 2011 IL App (1st) 102914, ¶ 30. An agency's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* "The reviewing court is not to reweigh the evidence or make an independent determination of the facts." *Id.* ¶ 28. The fact that an opposite conclusion is reasonable or that the reviewing court may have reached a different outcome does not justify the reversal of the administrative findings. *Id.* ¶ 30. " 'If the record contains evidence to support the agency's decision, it should be affirmed.' " *Id.* (quoting *Abrahamson*, 153 Ill. 2d at 88).

¶ 103    M.D. essentially requests that we reevaluate the credibility of A.D. and N.G. and reweigh the scientific evidence. We shall not do so, as it is not our function to reevaluate witness credibility or resolve conflicting evidence. *Abrahamson*, 153 Ill. 2d at 98; *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 681 (1995). M.D., however, contends that we can review the scientific evidence *de novo*, relying on this court's statement in *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 681 (1995), that "a reviewing court may evaluate documentary evidence presented in an administrative proceeding *de novo*." This argument is misplaced. The *Ambrose* court had before it primarily documentary evidence in the form of two maps (one from each party), as it was considering whether the plaintiffs met the contiguity requirement of section 7-2b of the School Code (105 ILCS 5/7-2b (West 1992)). *Ambrose*, 274 Ill. App. 3d at 678. Only one witness, the superintendent of one of the school districts, testified at the evidentiary hearing on behalf of the defendant that the map submitted by the defendant was used by his district in its day-to-day business. *Id.* at 679. On review, this court examined the maps submitted by the parties *de novo* and found that defendant's map was unreliable and did not directly conflict with the plaintiffs' maps. *Id.* at 681. Additionally, the court dismissed the superintendent's testimony finding it did not directly relate to the issue at hand. *Id.* Thus, without any evidence directly contradicting plaintiffs' maps, the reviewing court determined that the plaintiffs presented sufficient evidence to demonstrate the contiguity requirement had been met and the underlying decision was against the manifest weight of the evidence. *Id.*

¶ 104    In this case, the ALJ was presented with numerous witnesses and exhibits supporting the DCFS's determination to indicate M.D. Unlike the determination in *Ambrose*, the agency's decision not to expunge the indicated finding did not turn solely on documentary evidence, but required the court to weigh the evidence and consider the testimony of the numerous witnesses. Moreover, M.D. argues on appeal not that the scientific evidence itself was unreliable, but that it contradicts A.D.'s statements and, thus, M.D.'s argument inherently involves the weighing of evidence, both documentary and testimonial. As previously discussed, we will not reweigh the evidence or the determination by the agency as to the credibility of the witnesses. *Doe v. Department of Children & Family Services*, 265 Ill. App. 3d 907, 911 (1994); *S.W.*, 276 Ill. App. 3d at 681-82.

¶ 105    Based on the record and the deference accorded a decision entered by an administrative agency, we cannot say that a conclusion opposite to the agency's decision is clearly evident to justify reversal. The testimony of Newel, DiGangi, Monterey, Kick, and N.G. provides enough evidence for us to conclude that the agency could have found by a preponderance of the evidence that M.D. sexually abused A.D. according to the allegations. N.G. testified that A.D. told her that M.D. was "tickling my private parts" and that he put her hand on his penis.

Newel's testimony corroborated N.G.'s testimony as A.D. disclosed to Newel that M.D. had touched and tickled her private parts and made her touch his penis. Similarly, Monterey testified that A.D. disclosed to her that M.D. touched her private parts "in a bad way" and said that M.D. "put his private on her private." Kick also testified that A.D. told her that M.D. "pulls" and "tugs" at her genitals and "it hurts." In addition, DiGangi testified that A.D. disclosed that M.D. touched her private part, made her touch his penis, placed his private part on her private part, and that his touching hurt her.

¶ 106    Moreover, the ALJ expressly considered the inconsistencies in A.D.'s statements and found her to be credible, stating that "it is reasonable to assume a child of five would not relate precisely the same facts to each and every individual she spoke with." In addition, the testimony and evidence established that A.D. was abused on multiple occasions by M.D., not just on March 29, 2010. Accordingly, as Bahavar testified, A.D.'s statements regarding the sexual abuse related not only to what occurred on March 29, 2010, but also referenced other instances of abuse. The ALJ also considered whether N.G. coached A.D. and concluded that "none of the several individuals [A.D.] disclosed to saw any signs of coaching or coercion." Our review of the record supports these findings. Further, the witnesses testified that A.D.'s disclosures utilized age appropriate language, were spontaneous, and demonstrated a level of sexual knowledge beyond what a typical five year old would know. The ALJ found the testimony of the DCFS's witnesses and A.D.'s statements regarding the abuse to be credible and the Director adopted these conclusions. The record is more than adequate to support a finding that M.D. abused A.D. Thus, we cannot say that the agency's determination not to expunge the indicated finding against M.D. was against the manifest weight of the evidence.

¶ 107                                CONCLUSION
¶ 108    For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

¶ 109    Affirmed.