# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Tiller v. Department of Children & Family Services*, 2013 IL App (4th) 120504**

---

| | |
|---|---|
| Appellate Court Caption | JESSICA TILLER, Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES; and RICHARD H. CALICA, Director, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-0504 |
| Filed | August 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings arising from plaintiff's action seeking to reverse and expunge five indicated findings of abuse and neglect that the Department of Children and Family Services found were credible, three of the findings were reversed and expunged by the Director's final administrative decision, and on plaintiff's appeal from the trial court's decision on administrative review upholding the two remaining findings, one was reversed and the other was upheld. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 11-MR-276; the Hon. Paul G. Lawrence, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |

Counsel on
Appeal

Alan J. Novick (argued), of Bloomington, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Mary C. LaBrec (argued), Assistant Attorney General, of counsel), for appellees.


Panel

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices Appleton and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1    In January 2011, plaintiff, Jessica Tiller, sought to reverse and expunge five indicated findings of abuse and neglect that defendant, the Department of Children and Family Services (DCFS), determined were credible. In September 2011, DCFS Director Erwin McEwen (substituted by current director, Richard H. Calica, by operation of law) accepted the administrative law judge's (ALJ's) recommendations and issued a final administrative decision that reversed and expunged three of the indicated findings but determined that the remaining findings of (1) sexual penetration (89 Ill. Adm. Code 300.Appendix B (Allegation 19), amended at 25 Ill. Reg. 12781, 12797 (eff. Oct. 1, 2001)) and (2) substantial risk of physical injury/environment injurious to health and welfare by neglect (89 Ill. Adm. Code 300.Appendix B (Allegation 10/60), adopted at 25 Ill. Reg. 12781, 12789 (eff. Oct. 1, 2001)) were supported by a preponderance of the evidence. Tiller later filed a complaint, requesting administrative review of DCFS' determination pursuant to section 3-103 of the Code of Civil Procedure (Civil Code) (735 ILCS 5/3-103 (West 2010)). Following a May 2013 hearing, the circuit court affirmed DCFS' decision.

¶ 2    Tiller appeals, arguing that (1) DCFS' indicated finding of sexual penetration was against the manifest weight of the evidence, (2) DCFS' indicated finding of sexual penetration violated several of her constitutional rights, and (3) DCFS' indicated finding of substantial risk of physical injury/environment injurious to health and welfare by neglect requires reversal because it was based on "double hearsay." Because we agree only with Tiller's first argument, we affirm in part and reverse in part.

¶ 3                              I. BACKGROUND
¶ 4              A. DCFS' Indicated Findings of Abuse and Neglect Pursuant
                          to the Illinois Administrative Code
¶ 5    In January 2011, DCFS concluded an investigation into allegations that Tiller and C.C.

(born May 11, 1994)–a minor that Tiller had a sexual relationship with–had abused and neglected their daughter M.C. (born August 2, 2010). Specifically, DCFS found credible evidence to support the following indicated findings of abuse and neglect: (1) bone fractures (89 Ill. Adm. Code 300.Appendix B (Allegation 9/59), amended at 25 Ill. Reg. 12781, 12789 (eff. Oct. 1, 2001)); (2) substantial risk of physical injury (abuse) (89 Ill. Adm. Code 300.Appendix B (Allegation 10/60), adopted at 25 Ill. Reg. 12781, 12789 (eff. Oct. 1, 2001)); (3) substantial risk of physical injury/environment injurious to health and welfare by neglect (89 Ill. Adm. Code 300.Appendix B (Allegation 10/60), adopted at 25 Ill. Reg. 12781, 12789 (eff. Oct. 1, 2001)); and (4) cuts, bruises, welts, abrasions, and oral injuries (89 Ill. Adm. Code 300.Appendix B (Allegation 11/61), amended at 25 Ill. Reg. 12781, 12791 (eff. Oct. 1, 2001)). In addition, DCFS also found that credible evidence supported indicating Tiller for sexual penetration (89 Ill. Adm. Code 300.Appendix B (Allegation 19), amended at 25 Ill. Reg. 12781, 12797 (eff. Oct. 1, 2001)), because Tiller admitted having a sexual relationship with C.C., who at the time of M.C.'s birth was 16 years old. Later that month, Tiller appealed DFCS' indicated findings.

¶ 6                    B. The State's Allegations Under the Juvenile Court Act

¶ 7        In March 2011, the State filed a first supplemental petition for adjudication of wardship, alleging that Tiller and C.C. had neglected M.C. pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2010)). Specifically, the State alleged, as follows:

"[M.C.], who is under the age of [18] years, is residing in an environment injurious to her welfare in that while residing with her parents, *** Tiller and [C.C.], [M.C.] received injuries that would not ordinarily occur except for the acts or omissions of a parent or custodian. Specifically, [M.C.] was diagnosed with two healing rib fractures that have been determined by a medical expert to be caused by physical abuse. This creates a risk of harm to [M.C.]"

¶ 8        Following an adjudicatory hearing conducted later that month, the trial court entered an order adjudicating M.C. a neglected minor based on Tiller's admission to the State's neglect allegation. (The court also determined that C.C., who did not appear at the hearing, failed to provide M.C. the proper care or support as the State alleged in its original petition for adjudication of wardship.) After an April 2011 dispositional hearing, the court adjudicated M.C. a ward of the court and maintained DCFS as her guardian. (DCFS placed M.C. with Tiller's half-sister, Gina Dutro; the court's findings pursuant to the Juvenile Court Act are not the subject of this appeal.)

¶ 9                    C. The Evidence Presented at Tiller's Appeal
                              of DCFS' Indicated Findings

¶ 10        In July 2011, an ALJ considered Tiller's appeal of DCFS' indicated findings pursuant to section 7.16 of the Abused and Neglected Child Reporting Act (Child Reporting Act) (325 ILCS 5/7.16 (West 2010)). (C.C. did not appeal DCFS' indicated findings.) A summary of the pertinent evidence presented at that hearing–documented by transcripts and the ALJ's

written recommendations and opinion issued later that month–showed the following.

¶ 11    On November 8, 2010, DCFS received information from Crystal Dozart, Dutro's friend, regarding M.C.'s injuries and Tiller's interaction with C.C. Specifically, DCFS documented Dozart's allegations, as follows:

> "[DCFS] received a hotline report *** stating that [M.C.] had two black eyes in the past on two separate occasions with blood being noted in the eye on one occasion; had stiff/rigid torso; that there was ongoing domestic violence in the home; and that *** Tiller is having a sexual relationship with a minor, [C.C.], who is 16 years old and the father of [M.C.]"

Dozart later informed DCFS that Tiller (1) lived with C.C. and (2) had posted to Dozart's social networking page that she "wanted to kill herself." Dozart also provided DCFS pictures of M.C. that, according to medical personnel, showed significant swelling to both of M.C.'s eyes, bleeding in the white of M.C.'s left eye, and bruising on M.C.'s eyelids.

¶ 12    Tiller and M.C. resided with Tiller's parents, her older brother, and her brother's friend. Tiller estimated that C.C. "lived there occasionally" from fall 2009 until approximately November 2010. Tiller admitted her sexual relationship with C.C. and acknowledged that she knew he was a minor. While studying for a nursing exam, Tiller allowed M.C. to stay with Dozart for four days (November 2, 2010, to November 6, 2010). When Dozart returned M.C. to Tiller on November 6, 2010, Dozart informed Tiller that M.C. was "stiff." Tiller immediately had M.C. evaluated by a doctor, but no abnormalities were detected. M.C.'s pediatrician later examined M.C. in the presence of a DCFS investigator and opined that M.C.'s eyes were "sensitive and that veins are noticeable and give the impression that there is darkness around her eyes but it is actually normal." Tiller admitted that she placed M.C. at risk when she allowed Dozart, a person Tiller did not know, to care for M.C.

¶ 13    The ALJ noted that he reviewed numerous pages of Tiller's and Dozart's postings to their respective social networking pages that were provided by DCFS and did not find evidence to corroborate Dozart's suicide claim. Instead, the ALJ noted that Tiller's postings repeatedly expressed love for M.C. and that Dozart's postings on Tiller's social networking page were positive toward Tiller. Dozart's postings did not indicate that M.C. was experiencing any medical or physical abnormalities during the time she cared for M.C.

¶ 14    Dutro stated that Dozart's comment regarding Tiller's desire to commit suicide was false, and Dozart's skill in photography enabled her to alter photographs. "At one time" Dutro saw a "red speck" on M.C.'s right eye and bruising on both of M.C.'s eyelids. When Dutro confronted Tiller, she informed Dutro that M.C. sustained the eye injuries in August 2010 when C.C. accidently dropped a container of baby wipes on M.C. while he was changing her diaper. The ALJ noted that Tiller's explanation to Dutro was consistent with her later account to the DCFS investigator.

¶ 15    Dutro also testified that during the time Tiller was pregnant with M.C., C.C. lived with Tiller at the home Tiller shared with her parents. Dutro noted that C.C. also spent nights at other places "from time to time," which included staying with his brothers. Dutro characterized C.C.'s attitude toward staying with Tiller at the home Tiller shared with her parents as C.C.'s "safe zone," because C.C.'s "crazy" mother moved to Lincoln, Illinois, and

-4-

lived in a one-bedroom motel room. Dutro admitted that since May 2009, she had not lived in the home Tiller purportedly shared with C.C. Dutro added that although she did not know whether C.C. spent the night at the home Tiller shared with her parents, she assumed C.C. did because C.C. would be present "most of the time" she visited. In response to the ALJ's question, Dutro stated that C.C. "is basically homeless."

¶ 16     Tiller's mother, Teresa Whitmer, testified that C.C.'s mother left C.C. in Gridley, Illinois, when she moved to Lincoln. Whitmer opined that C.C.'s mother "did not care where [C.C.] was" and estimated that C.C. stayed at her home "from time to time" but also spent the night with his two brothers, one of whom lived in Lincoln and the other in Lexington, Illinois. Whitmer added that C.C. would also occasionally stay with his other friends. Whitmer neither monitored C.C.'s movements nor knew from day to day whether C.C. would stay the night at her home. When he did stay at Whitmer's home, C.C. would sleep either on the floor or the couch or in Tiller's room, which did not have a door. Whitmer confirmed that C.C. did not receive mail at her home and characterized C.C. as "essentially homeless." (Whitmer also testified briefly about physical altercations that occurred in her home between Tiller and her older brother.)

¶ 17     Tiller confirmed that C.C. would stay overnight at her mother's home about two to four nights a week but never for an entire week. Tiller agreed with Whitmer's characterization, stating that although C.C. kept some of his clothes at Whitmer's home, he was homeless.


¶ 18                              D. The ALJ's Findings of Fact

¶ 19     Based on the evidence presented, the ALJ made, in pertinent part, the following findings of fact:

> "2. At a time when [Tiller] was [19] years[ ]old and an adult[,] she had sexual intercourse with [C.C.] when he was [15] years[ ]old.
>
> 3. At the time [Tiller] had sexual intercourse with [C.C.] they were both residing in the same residence. This finding is supported by the testimony and evidence[,] including the finding by the Juvenile Court that [M.C.] was residing with [Tiller] and [C.C.] at the time [M.C.] received injuries that would not ordinarily occur except for the acts or omissions of a parent or custodian. In order for that paragraph to be true, all statements in the paragraph must be true. Therefore, the Juvenile Court found that [C.C.] and [Tiller] were residing together.
>
> ***
>
> 5. *** The evidence is not sufficient to determine which *** caretaker is the most likely to have caused the rib fractures.
>
> * * *
>
> 8. The hearsay statements of *** Dozart were not reliable. *** Dozart intentionally lied about [Tiller].
>
> 9. Appellant admitted that she had created a substantial risk of physical injury by allowing Dozart to care for [M.C.]"

¶ 20       E. The DCFS Director's Acceptance of the ALJ's Recommendations

¶ 21     In September 2011, McEwen accepted the ALJ's recommendations and issued a final administrative decision that (1) DCFS had not proved the indicated findings of bone fractures; substantial risk of physical injury (abuse); and cuts, bruises, welts, abrasions, and oral injuries by a preponderance of the evidence and (2) DCFS had met its burden with regard to the indicated findings of sexual penetration and substantial risk of physical injury/environment injurious to health and welfare by neglect. (Although the trial court's March 2011 adjudicatory order found M.C. neglected, in part, because she suffered two rib fractures, DCFS determined that because "the evidence did not point to any one person being more likely to have caused the fractures than anyone else," it concluded that the indicated findings of bone fractures against Tiller had not been proved.)

¶ 22                     F. Circuit Court Review

¶ 23     Later that same month, Tiller filed a complaint, requesting administrative review of DCFS' decision pursuant to section 3-103 of the Civil Code. Specifically, Tiller sought to (1) reverse the two aforementioned indicated findings McEwen found were supported by credible evidence and (2) expunge those two indicated findings from the State's central registrar of suspected child abusers. Following a May 2013 hearing, the circuit court affirmed DCFS' final administrative decision.

¶ 24     This appeal followed.

¶ 25                      II. ANALYSIS

¶ 26                   A. Standard of Review

¶ 27     "In an appeal from an administrative agency's decision, we review the agency's determination, not that of the trial court." *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 23, 985 N.E.2d 654. Under the Civil Code, a reviewing court considers all questions of fact and law presented by the entire record. 735 ILCS 5/3-110 (West 2010). In administrative review cases, this court reviews factual questions under the manifest weight standard, questions of law *de novo*, and mixed questions of law and fact under the clearly erroneous standard. *Lambert*, 2013 IL App (2d) 110824, ¶ 23, 985 N.E.2d 654. An administrative agency's factual findings are against the manifest weight of the evidence only when the opposite conclusion is clearly evident. *Clarcor, Inc. v. Hamer*, 2012 IL App (1st) 111674, ¶ 26, 972 N.E.2d 692.

¶ 28                 B. DCFS' Indicated Findings

¶ 29                 1. *Sexual Penetration*

¶ 30     Tiller argues that DCFS' indicated finding of sexual penetration was against the manifest weight of the evidence. We agree.

¶ 31     The Child Reporting Act requires DCFS to maintain "a central register of all cases of suspected child abuse or neglect reported and maintained by [DCFS] under this Act." 325 ILCS 5/7.7 (West 2010). After a report is made, the child protective service unit must

investigate and determine whether those reports are "indicated," "unfounded," or "undetermined." 325 ILCS 5/7.12, 7.14 (West 2010). The Act defines " '[a]n indicated report' " as "a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2010). A person who is subject to an indicated report may request that DCFS amend the record of the report or remove the record of the report from the State Central Register. 325 ILCS 5/7.16 (West 2010).

¶ 32     Section 3 of the Child Reporting Act defining "abused child," provides, in pertinent part, as follows:

> " 'Abused child' means a child whose parent or immediate family member, or any person responsible for the child's welfare, or any individual residing in the same home as the child, or a paramour of the child's parent[.]" 325 ILCS 5/3 (West 2010).

The definition of abused child under section 3 of the Child Reporting Act continues by specifically segregating the types of abuse, neglect, or injury that has been inflicted upon the minor by the acts, omissions, or acquiescence of the aforementioned category of persons.

¶ 33     Allegation No. 19, which is contained within appendix B of section 300 of Title 89 of the Illinois Administrative Code (Administrative Code), entitled "Sexual Penetration," provides, in part, the following definition:

> "Any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or any animal or object into the sex organ or anus of another person. This includes acts commonly known as oral sex (cunnilingus, fellatio), anal penetration, coition, coitus, and copulation." 89 Ill. Adm. Code 300.Appendix B (Allegation 19), amended at 25 Ill. Reg. 12781, 12797 (eff. Oct. 1, 2001).

Appendix B of section 300 of title 89 of the Administrative Code "describes the specific incidents of harm which must be alleged to have been caused by the acts or omissions of the persons identified in Section 3 of the [Child Reporting Act] before [DCFS] will accept a report of child abuse or neglect." 89 Ill. Adm. Code 300.Appendix B, amended at 25 Ill. Reg. 12781, 12785 (eff. Oct. 1, 2001).

¶ 34     Tiller contends that to sustain the indicated finding of sexual penetration against her, DCFS was required to show (1) actual penetration as outlined in allegation No. 19 contained within Appendix B of section 300 of title 89 of the Administrative Code and (2) that she satisfied one of the categories of persons that caused the sexual penetration as identified in section 3 of the Child Reporting Act. In this regard, Tiller concedes that she engaged in sexual intercourse with C.C., whom she knew to be a minor, but asserts that DCFS failed to show that she was an offender as contemplated by section 3 of the Child Reporting Act. In other words, Tiller posits that DCFS failed to show that she was C.C.'s parent or immediate family member, a person responsible for C.C.'s welfare, residing in the same home as C.C., or a paramour of C.C.'s parent.

¶ 35     In this case, DCFS adopted, in pertinent part, the ALJ's finding of fact that "at the time [Tiller] had sexual intercourse with [C.C.], they were both residing in the same residence." The ALJ based that finding on evidence presented concerning C.C.'s cohabitation with Tiller

and the trial court's March 2011 adjudicatory order in which the court determined that M.C. was in an environment injurious to her welfare because "while living with parents[, M.C.] suffered two broken ribs which were determined to be non-accidental by a medical expert." We, therefore, limit our review accordingly.

¶ 36    Cognizant of the standard of review and the deference this court affords DCFS' factual findings, we disagree that in this case the basis articulated was sufficient to substantiate an indicated finding of sexual penetration. Although the Administrative Code does not provide a definition of "residing," the plain and ordinary meaning of the term "reside" is "to dwell permanently or continuously **:** occupy a place as one's legal domicile." Merriam-Webster's Collegiate Dictionary 993 (10th ed. 2000). See *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 545, 950 N.E.2d 256, 262 (2010) ("[I]n determining the plain and ordinary meaning of words, we may consult a dictionary if a word is undefined in the statute.").

¶ 37    Here, the evidence presented shows that C.C. was a 16-year-old minor that, after being essentially abandoned by his mother, sought refuge in a variety of different residences, including the home owned by Tiller's parents from fall 2009 to November 2010. C.C.'s plight precipitated Whitmer's generous open invitation to allow C.C. to stay at her home when he desired, noting that she could not be certain whether C.C. would be at her home on any given date. In this regard, the testimony from Dutro, Tiller, and Whitmer showed that C.C. was not *residing* in Whitmer's home with Tiller but, instead, was a homeless minor who would seek shelter in Whitmer's home when convenient.

¶ 38    With regard to DCFS' reliance on the trial court's March 2011 adjudicatory order, we note that despite the language of that order pertaining to M.C.'s living arrangements with her parents, we disagree that the court specifically found C.C. and Tiller were "residing together" because, simply put, the status of those entrusted to care for minors–such as parents–is not the focus or purpose of an adjudicatory hearing. In *In re J.W.*, 386 Ill. App. 3d 847, 852-53, 898 N.E.2d 803, 808 (2008) (quoting *In re R.B.*, 336 Ill. App. 3d 606, 614-15, 784 N.E.2d 400, 407 (2003)), we outlined the purpose of an adjudicatory hearing, as follows:

> " 'Section 2-3 of the [Juvenile Court] Act defines neglected children as those who live under certain conditions, such as *** a minor under 18 years of age "whose environment is injurious to his or her welfare" [citation], or *** a minor "who is not receiving the proper or necessary support" [citation]. These definitions do not address the question of who may be responsible for such adverse conditions because, in the first instance, that question does not matter. *What matters initially is only whether the child is neglected because these conditions exist*. After all, the Act's mandate is to protect children, not to assign blame to parents.' " (Emphasis added.)

¶ 39    During the July 2011 hearing on Tiller's appeal of DCFS' indicated findings, Tiller clarified her admission at the March 2011 adjudicatory hearing by testifying that she created a substantial risk of physical injury to M.C. based on her belief that she voluntarily transferred custody of M.C. to Dozart during a four-day period without sufficiently vetting Dozart's qualifications to care for M.C. This became a finding of fact DCFS adopted. Moreover, we note that at the time the trial court entered the adjudicatory order, the evidence

was insufficient to determine who inflicted the injuries M.C. sustained. Thus, consistent with our guidance in *Weaver*, we interpret the court's adjudicatory order as setting forth that regardless of who caused M.C.'s injuries or when those injuries were inflicted–that is, while M.C. resided with her mother, Tiller; her father, C.C.; or her parents, collectively–M.C. was no less neglected under the circumstances presented.

¶ 40    Accordingly, we conclude that DCFS' decision to deny Tiller's request to reverse the indicated finding of sexual penetration and expunge that finding from the State's central register of suspected child abusers was against the manifest weight of the evidence. Having so concluding, we need not address Tiller's constitutional claims. See *Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398, ¶ 50, 976 N.E.2d 1160 ("We should avoid constitutional questions when the case may be decided on other grounds.").

¶ 41                    2. *Substantial Risk of Physical Injury/Environment Injurious*
                              *to Health and Welfare by Neglect*

¶ 42    Tiller also argues that DCFS' indicated finding of substantial risk of physical injury/environment injurious to health and welfare by neglect requires reversal because it was based on "double hearsay." We disagree.

¶ 43    Allegation No. 10/60, which is contained within appendix B of section 300 of title 89 of the Administrative Code, entitled "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare," provides, in part, the following definition:

> "Substantial risk of physical injury means that the parent, caregiver, immediate family member aged 16 or over, other person residing in the home aged 16 or over, or the parent's paramour has created a real and significant danger of physical injury that would likely cause disfigurement, death, or impairment of physical health or loss or impairment of bodily functions (abuse). *** This allegation of harm also includes incidents of violence or intimidation directed toward the child that have not yet resulted in injury or impairment but that clearly threaten such injury or impairment (abuse) or placing a child in an environment that is injurious to the child's health and welfare [(*i.e.*, domestic violence, intimidation, and a child's participation in a criminal act)] (neglect)." 89 Ill. Adm. Code 300.Appendix B (Allegation 10/60), adopted at 25 Ill. Reg. 12781, 12789 (eff. Oct. 1, 2001).

¶ 44    In this case, DCFS explained the basis of its indicated finding of neglect, as follows:

> "As noted above, the Juvenile Court found that [Tiller's] actions had created an injurious environment for [M.C.] *** [Tiller] admitted that she had caused a substantial risk of injury. In addition, this ALJ finds that the domestic violence between [Tiller] and her brother also contributed to the injurious environment. Therefore, this allegation must remain indicated."

When the record shows that a court has entered a judicial finding of child neglect with respect to a minor–as in this case–the indicated report's accuracy is "conclusively presumed on such finding" and "there shall be no such right to a hearing on the ground of the report's inaccuracy." 325 ILCS 5/7.16 (West 2010); see also *Burris v. Department of Children &*

*Family Services*, 2011 IL App (1st) 101364, ¶ 44, 951 N.E.2d 1202.

¶ 45 Here, Tiller's claim that DCFS' indicated finding of neglect was based on "double hearsay" is contradicted by the record, in that the indicated finding was based on her own admission. Accordingly, we reject Tiller's claim without further analysis.

¶ 46 III. CONCLUSION

¶ 47 For the reasons stated, we affirm in part, *i.e.*, we affirm DCFS' indicated finding of risk of physical injury/environment injurious to health and welfare by neglect; and we reverse in part, *i.e.*, DCFS' indicated finding of penetration.

¶ 48 Affirmed in part and reversed in part.