**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220320-U

Order filed August 2, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| LYNETTE FUNK, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-22-0320 |
| | ) | Circuit No. 21-MR-809 |
| ILLINOIS DEPARTMENT OF CHILDREN | ) | |
| AND FAMILY SERVICES, | ) | The Honorable |
| | ) | John C. Anderson |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Brennan and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The DCFS Director properly denied Lynette Funk's request that her indicated finding for neglect be expunged from the State Central Register because: (1) the administrative proceedings did not violate her constitutional rights; and (2) the indicated finding was adequately supported by evidence showing that she drove with her minor son in the car while she was intoxicated.

¶ 2    The Illinois Department of Children and Family Services (DCFS) entered an indicated finding for neglect after concluding that the plaintiff, Lynette Funk, drove under the influence of

alcohol while her minor son, R.F., was in the car, and she sought to have the finding expunged from the record. At the administrative hearing on her request, the administrative law judge upheld the indicated finding as supported by the evidence. The DCFS Director subsequently adopted those findings and conclusions and denied Funk's request. She sought administrative review in the trial court, which affirmed the Director's decision.

¶ 3     Funk filed an appeal to this court, raising constitutional and evidentiary challenges. We affirm.

¶ 4                              I. BACKGROUND

¶ 5     DCFS entered an indicated finding of child neglect against Funk based on allegations that in September 2019, she drove a car with her three minor children, N.F., R.F., and J.F., while under the influence of alcohol. Funk sought removal of the neglect finding from the State Central Register, and a DCFS administrative law judge (ALJ) held an administrative hearing in Will County to determine whether the indicated finding was supported by credible evidence.

¶ 6     At that hearing, DCFS presented testimony from one witness, Anthony Ollins, who was the Area Administrator for the agency's Joliet and Kankakee Office for Investigations. Ollins presented the investigative report drafted by former DCFS child protection investigator Michelle Williams-Flowers because she and her supervisor were no longer working for DCFS at the time of the hearing. To provide a foundation for admission of the investigation report, Ollins explained how alleged perpetrators, victims, and other witnesses were routinely contacted as part of an investigation after receipt of an allegation of child abuse or neglect. The information gathered during the investigation was entered into a digital tracking system and then used to draft an investigative report that was maintained and used in the normal course of DCFS's business.

2

¶ 7        Funk objected to the admission of Williams-Flowers's investigative report on the grounds of "hearsay and foundation," arguing that it contained "hearsay upon hearsay upon hearsay and Mr. Ollins had no direct *** link to this investigation." In response, Ollins stated that he had access to the report as Area Administrator, despite not being directly involved in the investigation. He was also familiar with Williams-Flowers and her work. The ALJ admitted the report over Funk's objection, stating that she would "determine what weight, if any, to give any of the hearsay information contained within the investigative file."

¶ 8        Funk presented testimony from Maria Acosta at the hearing. Acosta testified that her son attended the same school and played on the same soccer team as R.F. The two families carpooled and sometimes attended the same social activities. Acosta recounted that she spoke to Funk for 10 or 15 minutes on September 11 while at their sons' soccer game. During that conversation, Funk did not exhibit any behavior indicating that she was intoxicated or had been drinking. Acosta stated that she was familiar with the signs of intoxication because she managed a restaurant for 20 years before becoming a bailiff.

¶ 9        After the soccer game, Acosta received a call from Funk. Funk was upset because R.F. had gotten out of the car during a stop due to Funk driving the wrong car. Funk asked Acosta to make sure R.F. was safe. Acosta stated that Funk sounded upset, but not intoxicated, during the call. After Acosta found R.F., he told her that he had called the police because his mother was not driving the proper car. The police subsequently permitted Acosta to take R.F. to his father's office. When Funk called her later, Acosta again did not think she sounded intoxicated.

¶ 10       Funk testified that she had pled guilty in 2018 to driving while under the influence of alcohol (DUI) two years earlier and was sentenced to court supervision. As part of her plea agreement, Funk was required to install a breathalyzer device in her vehicle. Funk and the

children's father had been divorced for about a year, and tensions in the family remained high. Funk explained that her relationship with R.F., who was 14 years old, was particularly troubled. She had taken away his phone and video game system and grounded him multiple times for using vapes, including vapes containing marijuana, and he had not been truthful with her. For those reasons, she believed R.F. was upset with her that day.

¶ 11    On September 11, Funk was working in direct sales, and her boss had accompanied her on her route. Because she was embarrassed to undergo breathalyzer tests every 30 minutes with her boss present, Funk drove a car without that device that day. After work, she picked J.F. up at school and went to R.F.'s soccer game. While driving with her three children after the game, she noticed R.F. on the phone. He told her he had called 911 because she was drinking and driving. She asked him to hang up the phone so they could talk, but he refused and attempted to get out of the car. She pulled over to allow him to get out. She then called Acosta, asking her to check on R.F. Funk also asked N.F. if she would drive the family, but she declined despite having a learner's permit. When asked directly, Funk denied drinking any alcohol that day, but she admitted that driving a car without a breathalyzer violated the terms of her plea agreement.

¶ 12    The ALJ made a number of factual findings, concluding that a preponderance of the evidence supported the denial of Funk's request to expunge her indicated neglect finding. She noted that Funk was required to drive a car with a breathalyzer installed but was driving R.F. and his siblings in a car without that device on September 11. While in the car, R.F. observed that they had swerved and hit a curb. When he told his mother, she became angry with him. Feeling unsafe, R.F. called the police, which triggered a hotline call to DCFS.

¶ 13    DCFS's investigator Williams-Flowers separately interviewed all three minors about the incident and filed the report that Ollins presented at the administrative hearing. In that report,

4

Williams-Flowers indicated that R.F. believed his mother was intoxicated based on several facts: her decision to take a car without a breathalyzer device, the presence of empty alcohol bottles in the car, the car hitting the curb, and his mother's anger when he remarked about that incident. Because his mother had had problems with alcohol since he was in fifth grade, R.F. recognized when she was intoxicated and knew she often fell asleep after drinking. He felt unsafe that day because he believed she had had too much to drink, prompting him to call the police for help. R.F. recounted that his mother made him get out of the car after learning about the call and then drove away with his sister and brother. The mother of one of R.F.'s teammates found him, and she took R.F. to his father's office after the police arrived in response to the 911 call.

¶ 14       Williams-Flowers also interviewed R.F.'s sister, 16-year-old N.F., who noted that Funk was driving a car without a breathalyzer even though her prior DUI required her to use that device. N.F. explained that Funk sometimes took the car without the device after she had been drinking to avoid the breathalyzer testing. N.F. believed that Funk was intoxicated that day and stated that her mother pulled over to throw out her empty alcohol bottles after R.F. called the police. After throwing R.F. out of the car, Funk became upset and called, trying to convince him to come back. R.F., however, was afraid to get back in the car while Funk was intoxicated. N.F. also reported feeling unsafe while driving in the car with her mother, but she indicated that she had refused her mother's request that she drive because N.F. did not feel like driving at that time.

¶ 15       In Williams-Flowers' interview with J.F., who was then 11 years old, he recalled that Funk was intoxicated and described how she pulled over at a park to throw out empty alcohol bottles. He also reported feeling unsafe in the car and believed his brother did the right thing by calling police because Funk was in no condition to drive. J.F. described his mother as upset and yelling when she called R.F. to try to convince him to rejoin them.

¶ 16        According to the investigative report, Williams-Flowers made several unsuccessful attempts to interview Funk. DCFS also offered evidence confirming receipt of a September 2019 hotline report stating that Funk was intoxicated while driving with R.F. After finishing its investigation, DCFS concluded that credible evidence supported an indicated finding of neglect against Funk under "allegation of harm #60 – Environment Injurious to Health and Welfare." It notified her of the indicated finding, which required her name to be placed on DCFS's State Central Register for five years. DCFS also advised Funk of her right to appeal, and she subsequently filed an administrative request to expunge the indicated finding of neglect. 325 ILCS 5/7.16 (West 2020); 89 Ill. Adm. Code § 336.60 (2017).

¶ 17        Noting that the children gave consistent descriptions of the events and their mother's degree of intoxication despite being interviewed separately, the ALJ found that Funk was intoxicated while driving R.F. The ALJ resolved the discrepancy between the children's accounts and Acosta's belief that Funk was not intoxicated by noting that the children had greater "familiarity with [Funk's] demeanor/behavior when she drinks alcohol," which placed them "in a better position than Ms. Acosta to recognize when [Funk] has been drinking." She added that, "Others that are unfamiliar with [Funk's] alcohol tolerance and behaviors may not necessarily recognize the same signs" as the children "during the course of a short conversation." For those reasons, she found the children's testimony more compelling than Acosta's.

¶ 18        In addition, the ALJ cited Funk's failure to explain the alcohol bottles that all three children observed in the car that day. The ALJ believed that Funk's failure to provide any explanation was especially pertinent because she had testified that her boss was with her in the car before she picked up the children. "Based on the totality of the evidence presented, the ALJ [found] that a preponderance of the evidence suggests, more likely than not, that [Funk's] actions

6

on the day in question created a likelihood of harm to [R.F.'s] health, physical well-being or welfare in blatant disregard of her parental responsibilities," as alleged in DCFS's allegations.

¶ 19 Because DCFS had met its burden of showing Funk's alleged negligence, the ALJ recommended that the DCFS Director deny Funk's request to expunge the indicated finding of neglect from the State Central Register. After reviewing the ALJ's recommendation, the Director agreed and adopted the ALJ's findings and conclusions.

¶ 20 Funk sought administrative review of the denial in the Will County circuit court. DCFS filed its answer under seal. In her complaint, Funk argued that her due process right to cross-examine the witnesses against her was violated when the ALJ admitted and relied on the children's hearsay statements contained in Williams-Flowers's investigative report. She also asserted a due process violation when the ALJ considered her use of a car without a breathalyzer as a separate basis for the indicated finding because it was not part of the allegations against her. Finally, Funk contended that her right to proper notice was denied when the ALJ's finding that DCFS had presented enough evidence to support its indicated finding of neglect relied on her violation of the order requiring her to drive a car with a breathalyzer device, which was not part of DCFS's initial allegations, as well as her driving with R.F. while intoxicated.

¶ 21 In its response, DCFS maintained that the Director's decision should be upheld because it was not against the manifest weight of the evidence or clearly erroneous. Funk admitted that the three children's statements that she was driving a car without the mandated device were true, helping to support the finding that she drove while intoxicated. Viewed together, the children's statements and Funk's admissions constituted a blatant disregard for Funk's parental duties by showing that her actions created a likelihood of harm to R.F.'s health, physical well-being, and welfare. The Director also disputed Funk's claim that the ALJ improperly relied on hearsay in

7

the investigative report by noting that the administrative rules permit the admission of hearsay evidence. 89 Ill. Admin. Code § 336.120(b) (2017). Pursuant to those rules, the file DCFS maintained as part of its investigation could be considered when entering a neglect finding. Because the rules allowed the challenged evidence, the ALJ properly admitted and relied on the evidence contained in DCFS's investigative file.

¶ 22    In her response, Funk argued that DCFS's rules could not "trump" her constitutional right to due process. She maintained that she was denied due process because the children's inculpatory hearsay statements were not subject to cross-examination. She also reasserted her challenge to the ALJ's reliance on her driving a car not equipped with a breathalyzer unit. The trial court affirmed the denial of Funk's request to expunge the indicated finding of abuse, and she filed a timely notice of appeal.

¶ 23                                    II. ANALYSIS

¶ 24    Funk raises two issues on appeal: (1) whether her due process rights were violated when she was indicated for child neglect based on hearsay evidence in DCFS's investigative report showing that she drove under the influence of alcohol with her minor son R.F. in the car; and (2) whether it was error to indicate Funk for child neglect due to driving a car without a court-ordered breathalyzer when she was not given prior notice of that allegation. Because this case is before us on administrative review, we examine the decision of the Director, not the ALJ or the trial court. 325 ILCS 5/7.16, 11.6 (West 2020); 735 ILCS 5/3-102 (West 2020); 89 Ill. Admin. Code § 336.20(a) (2017); *L.F. v. Department of Children & Family Services*, 2015 IL App (2d) 131037, ¶ 45. Here, the ALJ conducted the hearing, served as the fact finder, and made recommendations to the Director. The Director, in turn, adopted the ALJ's findings and recommendations in their entirety. While we review any relevant factual findings to see whether

8

they are against the manifest weight of the evidence, we review the ultimate question of law *de novo*. *Tiller v. Department of Children & Family Services*, 2013 IL App (4th) 120504, ¶ 27.

¶ 25                             A. Admission of Hearsay Evidence

¶ 26        Funk initially argues that her due process rights were violated when the ALJ relied on the children's hearsay statements in DCFS's investigative report, which precluded Funk from cross-examining the witnesses against her. In support, she cites *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 82, in which the court held that a decisionmaker's reliance on "indispensable" hearsay testimony that was not subject to cross-examination violated due process. She argues that here, as in *Kimball*, the ALJ's reliance on the children's hearsay statements in the report violated due process because Funk was similarly unable to cross-examine essential witnesses when DCFS did not call the children nor Williams-Flowers, as the drafter of the report, as witnesses. She asserts that the children's accounts included discrepancies that she could have probed to undermine their statements and to bolster Acosta's testimony that Funk did not appear intoxicated that day. On cross-examination, Funk also could have challenged the credibility of Williams-Flowers, whose departure from DCFS remained unexplained, and of the children, especially R.F., who had recently been disciplined by Funk.

¶ 27        We find the holding in *Kimble* to be readily distinguishable. That case involved the administrative review of a public school teacher's termination after being accused of physically assaulting a student. *Id.* ¶ 2. Those proceedings are governed by different administrative rules than those that apply to the DCFS proceedings here. We note that our legislature has crafted rules specifically addressing the unique authority and functions of an ALJ in a DCFS proceeding, mandating a different analysis in this case.

9

¶ 28    Under those rules, the ALJ is empowered to "conduct a fair, impartial and formal hearing *in which the strict rules of evidence do not apply*." (Emphasis added.) 89 Ill. Adm. Code § 336.120(b)(1) (2017). That includes permitting the ALJ to "take necessary steps to develop a full and fair record that contains all relevant facts" and "*allow into evidence all inculpatory and exculpatory evidence helpful* in determining whether an indicated perpetrator abused or neglected a child, *including oral and written reports and the investigative file*." (Emphases added.) 89 Ill. Adm. Code §§ 336.120(b)(6), (9) (2017). The Code also specifically permits the admission of "previous statements made by the child relating to abuse or neglect *as hearsay exceptions*." (Emphasis added.) 89 Ill. Adm. Code § 336.120(b)(10) (2017). The ALJ and Director "may rely upon" both inculpatory and exculpatory evidence "to the extent of its probative value." 89 Ill. Adm. Code § 336.120(b)(9) (2017). Moreover, the Administrative Procedures Act provides that "evidence not admissible under [the civil rules of evidence and privilege] may be admitted * * * if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." 5 ILCS 100/10-40(a) (West 2020). Applying those provisions, we conclude that the ALJ undoubtedly had the authority to admit the investigative report containing the children's hearsay statements and that both the ALJ and the Director could properly consider those statements when making their decisions.

¶ 29    Although litigants are undoubtedly entitled to due process, they are not entitled to unlimited process. Instead, they are entitled to only the process that is constitutionally due, including the chance to be heard, the right to cross-examine the witnesses against them, and the submission of impartial evidentiary rulings. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992). Because Funk does not challenge the constitutional validity of the administrative rules permitting the admission of hearsay evidence in this case, we hold that

10

her right to due process was not violated by the admission and consideration of the hearsay statements.

¶ 30    Nonetheless, Funk argues that her right to confront the witnesses against her was violated by the admission of the hearsay statements, citing *Colquitt v. Rich Township High School District No. 227*, 298 Ill. App. 3d 856 (1998). In *Colquitt*, a student's expulsion based on three other students' hearsay statements was found to violate the expelled student's right to confrontation. That court stated that the evidentiary value of the hearsay statements was improperly "bolstered by a school official's testimony that the [students were] 'reliable' " and noted that the three students were not subject to subpoena. *Id*. at 865. We note that the school official's testimony that the students were "reliable" did more than simply indicate a belief that their accounts were credible. It offered a far more global assessment of their character that is lacking in the instant case.

¶ 31    To support her view, however, Funk points to two isolated instances in DCFS's 50-page investigative report that briefly touch on the children's credibility. The first instance was a case note that stated, "[d]iscussed the investigation with the Area Administrator, Kenneth Leggin about the extension request and that the three children were interviewed by CPS and was credible." Notably, due to the usage of the singular form of the verb preceding "credible," it is unclear whether that description was intended to apply to the investigation, the extension request, or the children mentioned in the note. The second instance was a note entered by Williams-Flowers's supervisor after discussing the case with her. It stated, "CPS Investigator stated the children were consistent and creditable." Those limited descriptions reflected Williams-Flowers's professional assessment of the children's statements during their interviews, not an overall assessment of their "reliability," unlike in *Kimble*.

11

¶ 32        To draft a recommended course of action, Williams-Flowers undoubtedly had to evaluate the evidence. After reviewing the two fleeting references to the children's credibility in light of the entire investigative report, we conclude that they did not improperly bolster the children's testimony. The remarkable consistency across the children's accounts of the events despite them being interviewed individually at different times bolstered the credibility of their stories far more than two passing references to them appearing to be credible during the interviews.

¶ 33        In addition, unlike *Colquitt*, Funk had the ability to subpoena her children and Williams-Flowers to testify at the hearing if she wished to question them about their accounts, but she did not. See Ill. Admin. Code 89 § 336.115(b)(1)(A) (2017) (stating "the appellant and the Department have the right to: A) present and question witnesses"). We cannot say that she was denied the right to confront the witnesses against her when she failed to take any affirmative steps to exercise that right. *Sudzus v. Department of Employment Security,* 393 Ill. App. 3d 814, 825 (2009) (citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992)). Moreover, here, unlike in *Kimble* and *Colquitt*, the applicable administrative rules specifically permitted the consideration of hearsay evidence, which, by definition, precludes cross-examination of the speakers.

¶ 34        In further support of her position, Funk cites *People v. Ullrich*, 328 Ill. App. 3d 811, 813 (2002), which addressed the denial of a petition to rescind the statutory summary suspension of a driver's license. At the State's request, the civil hearing on the petition was continued to permit the arresting officer to testify, but the officer ultimately failed to appear at the rescheduled hearing. The appellate court reasoned that by changing the hearing date specifically to fit the officer's schedule, the trial court "may have unintentionally lulled Ullrich into believing he would be able to question the officer at the hearing." *Id.* at 826. Due to "the danger raised where

there is no showing that the motorist was informed of his right to subpoena and the consequences of failing to exercise it, and knowingly and intelligently waived it," the appellate court reversed the denial of the rescission petition and remanded the cause for a new hearing. *Id*. at 826-27.

¶ 35    In contrast, the record here is devoid of any suggestion that the conduct of the State or the ALJ somehow "lulled" Funk into giving up the right to subpoena witnesses that triggered the court's waiver review in *Ullrich*. Here, the date of the DCFS proceedings was never altered to accommodate the schedule of any of the State's witnesses. Because the *Ullrich* court relied on that alteration of the hearings dates to find that the State "lulled" the defendant into not subpoenaing the witness, *Ullrich* is distinguishable. We hold that Funk's confrontation and due process rights were not violated by the admission and consideration of the hearsay statements in DCFS's investigative report.

¶ 36                                    B. Lack of Notice

¶ 37    Funk next argues that her due process rights were violated because she did not receive notice of both allegations the ALJ relied on to uphold the indicated finding, precluding her from preparing an adequate defense. Principles of procedural due process required DCFS to provide her with "a definite charge, adequate notice, and a full and impartial hearing." *Scatchell v. Board of Fire & Police Commissioners for Melrose Park,* 2022 IL App (1st) 201361, ¶ 120. She contends that she was denied due process when she was not notified prior to the informal hearing that DCFS would rely on her use of a car without the mandated breathalyzer device as a ground for the indicated finding. She maintains that the only ground asserted in the DCFS notice was that she drove with R.F. while she was intoxicated. The ALJ improperly intermingled the two grounds in finding that DCFS had met its burden of showing by a preponderance of the evidence that her actions constituted neglect by creating a likelihood of harm to her minor son's health,

13

physical well-being, or welfare, in blatant disregard of her parental responsibilities. Because she did not receive proper notice of the allegation that she drove an improperly equipped car, Funk argues that the ALJ committed reversible error by relying on that ground, even in part.

¶ 38 To obtain relief, however, Funk has to establish prejudice due to the lack of notice. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 245 (2006); *People v. Soto*, 2022 IL App (1st) 201208, ¶ 104; *People v. Holmes*, 397 Ill. App. 3d 737, 741 (2010). While the record supports Funk's claim that she was not given adequate notice that she could be indicated for neglect due to driving with R.F. in an improperly equipped car, that showing alone does not dispense with Funk's burden of proof. We conclude that she has not carried that burden.

¶ 39 Initially, Funk does not dispute that she was properly notified of DCFS's allegation that the indicated finding was supported by evidence showing that she drove with R.F. while she was intoxicated. That notice stated that she was:

> "indicated for allegation #60-Substantial Risk of Physical
> Injury/Environment Injurious to Health and Welfare by Neglect as it has
> been assessed that you demonstrated a blatant disregard for the overall
> safety and well-being for your 14 year old son. Minors stated their
> mother had been drinking and she was intoxicated and saw their mother
> pull over at the park and throw out empty alcohol bottles. Based on CPS
> Investigator's interviews it has been assessed that you created a real,
> significant and imminent risk of harm to the child's health, physical well-
> being and welfare *while you drove under the influence*. It has also
> assessed that you showed a blatant disregard due to your actions and that
> you failed to exhibit adequate parental responsibilities and failed to

14

exercise reasonable precautionary measures to prevent or mitigate the imminent risk of moderate to severe harm to the child." (Emphasis added.)

¶ 40　　Notably, Funk has not argued that her indicated finding must be reversed even if DCFS presented sufficient admissible evidence of her intoxication while driving with R.F. Although she maintains that the ALJ's finding of intoxication violated her due process rights because it was grounded in hearsay evidence, we have already rejected that claim. *Supra* ¶ 32. Thus, if that factual finding is supported by sufficient evidence, including the children's hearsay statements, DCFS's indicated finding could be upheld on that basis alone.

¶ 41　　Having previously concluded that the children's hearsay accounts of the incident were admissible and could properly be considered by the ALJ and the Director (*supra* ¶ 32), we turn to the evidentiary basis for the ALJ's opinion and recommendation. After stating it had considered the totality of the evidence, the ALJ initially remarked that Funk's "admission of having driven a vehicle without a breathalyzer device raises a serious concern. *** [Her] blatant disregard of that precautionary and safety measure imposed by the Court, was, in the ALJ's opinion, more than just poor judgment. *** [That] blatant disregard of the safety measure, in the opinion of the ALJ, amounts to blatant disregard of her parental responsibility to ensure for her children's safety."

¶ 42　　Critically, however, the ALJ then "further disagree[d] with [Funk's] argument that the Department presented no evidence of intoxication" before discussing the evidence and reasoning underlying that conclusion:

> "All three minors, despite being interviewed separately, provided
> consistent accounts of the incident and all described the Appellant as
> having been intoxicated. All three minors reported feeling unsafe during

15

the incident. The ALJ suggests that given the minors' familiarity with the Appellant's demeanor/behavior when she drinks alcohol, that the minors were in a better position than Ms. Acosta to recognize when the Appellant has been drinking. Robert stated to CPI Williams-Flowers that he felt unsafe because he can recognize when his mother has had too much to drink, and therefore felt it necessary to call the police for help. Others that are unfamiliar with the Appellant's alcohol tolerance and behaviors may not necessarily recognize the same signs during the course of a short conversation. In addition, no explanation was provided for the empty alcohol bottles observed by all three minors inside the Appellant's vehicle, especially given the Appellant's testimony that she uses the vehicle for work purposes."

¶ 43    The Director expressly incorporated the ALJ's factual findings in the final administrative decision. Stating that "the Administrative Law Judge made specific findings of fact and conclusions of law that I adopt and incorporate into my decision," the Director adopted the ALJ's review of the evidence. Therefore, we attribute the ALJ's findings to the Director as well. After reviewing the record on administrative appeal to determine whether the factual finding that Funk was intoxicated while driving R.F. was against the manifest weight of the evidence, we conclude that the evidence was more than sufficient to uphold that finding. See *Tiller*, 2013 IL App (4th) 120504, ¶ 27 (stating the standard of review).

¶ 44    That does not end our inquiry, however, because DCFS also bore the burden of proving that a preponderance of the evidence supported its indicated finding of neglect. 89 Ill. Admin. Code § 336.115(c)(2) (2017) (stating '[i]n an administrative hearing: A) the Department carries

the burden of proof of justifying the refusal to amend, expunge or remove the record; and B) the Department must prove that a preponderance of the evidence supports the indicated finding"). In this context, a " '[p]reponderance of the evidence' means the greater weight of the evidence which renders a fact more likely than not." 89 Ill. Admin. Code § 336.20 (2017).

¶ 45    To establish the allegations in the notice sent to Funk, DCFS had to show by a preponderance of the evidence that her actions "create[d] a real, significant and imminent risk of harm to [R.F.'s] health, physical well-being and welfare," "showed a blatant disregard *** and failed to exhibit adequate parental responsibilities and failed to exercise reasonable precautionary measures to prevent or mitigate the imminent risk of moderate to severe harm to the child." The ALJ's factual finding that Funk drove with R.F. in the car while she was intoxicated is undoubtedly sufficient to support those findings. Indeed, it is difficult to imagine how the evidence would support a contrary holding.

¶ 46    Because the denial of Funk's request to expunge the indicated finding from the State Central Register was adequately supported by the finding that she was driving R.F. while under the influence of alcohol, she has failed to establish the necessary prejudice from the ALJ's additional finding that driving in a vehicle lacking a court-mandated breathalyzer device also risked his welfare and constituted a blatant disregard of her parental responsibilities. Accordingly, we affirm the denial of Funk's expungement request.

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we affirm the Director's decision.

¶ 49    Circuit court judgment affirmed.

¶ 50    Director's decision affirmed.

17