2024 IL App (1st) 230614-U

No. 1-23-0614

Order filed June 27, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| SAMUEL YUNEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | 21 CH 1871 |
| | ) | |
| ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY | ) | |
| SERVICES, | ) | Honorable, |
| | ) | Celia G. Gamrath, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The decision of the Director of the Illinois Department of Children and Family Services to deny medical doctor's request for expungement was not against the manifest weight of the evidence.

¶ 2    Plaintiff, Dr. Samuel Yunez, appeals from an order of the circuit court of Cook County affirming a final administrative decision of the Illinois Department of Children and Family Services (DCFS) denying his request to expunge an indicated finding of sexual penetration entered against him under the Abused and Neglected Child Reporting Act (Reporting Act) (325 ILCS 5/1

*et seq.* (West 2014)).

¶ 3    Dr. Yunez makes essentially two arguments on appeal: (1) the Administrative Law Judge (ALJ) erred and violated his constitutional right to cross-examine and confront witnesses by admitting out-of-court hearsay statements the alleged victims made during forensic interviews; and (2) the DCFS director's final administrative decision denying expungement was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    Dr. Yunez is a family practice physician with training and experience in obstetrics and gynecology. At the time of the events at issue, Dr. Yunez was 60 years old and had been a physician for over 30 years. Yolanda is the mother of twin daughters P.S. and C.S. Dr. Yunez delivered both children on November 26, 2001. The doctor was also P.S. and C.S.'s pediatrician.

¶ 6    On May 14, 2019, DCFS received a hotline report alleging that Dr. Yunez had sexually abused P.S. Specifically, it was alleged that during a gynecological examination, Dr. Yunez inserted his fingers into P.S.'s vagina, kissed and licked her vaginal area, and then asked her if she liked it.

¶ 7    DCFS investigated the matter and determined there was credible evidence to support indicated findings against Dr. Yunez for sexual penetration of P.S. and for substantial risk of sexual injury to her twin sister C.S.

¶ 8    In a letter dated December 11, 2019, DCFS notified Dr. Yunez of its indicated findings and advised him of his right to appeal the decision. He was also informed that if his administrative appeal was unsuccessful, the indicated findings would be retained on file in the state central register for fifty years. Dr. Yunez filed an administrative appeal seeking to have the indicated findings expunged.

¶ 9                                  A. Administrative Appeal Hearings

¶ 10    On October 27, 2020 and February 2, 2021, the ALJ conducted hearings pursuant to Dr. Yunez's request to expunge the indicated findings. Prior to the hearings, the ALJ admitted into evidence video recordings of both P.S.'s and C.S.'s forensic interviews taken at the Proviso Children's Advocacy Center. The parties stipulated to the foundations of the respective forensic interviews, and both were admitted into evidence without objection - subject to the doctor's counsel's right to cross examine both P.S. and C.S.

¶ 11    The following evidence was presented at the hearings. Yolanda testified through a Spanish language interpreter that on May 13, 2019, she took her 17-year-old twins to Dr. Yunez for return appointments to assess whether medication the doctor prescribed earlier had been effective in treating the twins' vaginal infections, which were possibly caused by intrauterine devices (IUDs). In addition, P.S. sought treatment for a foot injury she sustained while playing soccer.

¶ 12    Yolanda sat in the waiting room of Dr. Yunez's medical office while he examined her daughters, who had requested to be put in separate examination rooms. The doctor saw C.S. first, and after her examination was finished, she returned to the waiting area where she and Yolanda waited for P.S. While they were waiting, C.S. received a text message from P.S. asking C.S. to come to her examination room. When P.S. returned to the waiting area, her face looked "[v]ery different." Yolanda asked P.S. was anything wrong, because she looked like someone told "her she was going to die tomorrow."

¶ 13    In the car on the way home, P.S. was quiet and rested her head on the car seat. Yolanda continued asking P.S. "what was wrong," but P.S. just cried. When they arrived home, P.S. went to her room and locked the door. Later that evening, P.S.'s boyfriend came to the house and spoke with P.S. and C.S., and afterwards left. Then, sometime after midnight, the boyfriend returned to

3

the house, accompanied by his sister. The boyfriend spoke with Yolanda and discovered that she was unaware of what P.S. had told him occurred at the doctor's office. Yolanda started crying and asked P.S. to come out of her room.

¶ 14    Yolanda asked P.S. why she had not told her what happened at Dr. Yunez's office. P.S. responded that she did not say anything because she felt no one would believe her since Dr. Yunez had been her doctor all her life. Yolanda then testified as to what P.S. told her concerning the incident.

¶ 15    According to Yolanda, P.S. stated that when Dr. Yunez first came into the examination room, he made comparisons between P.S. and C.S., commenting that C.S. "would get mad easier and [was] talkative," while P.S. "was more quiet." Dr. Yunez examined P.S. with a "long stick" and a "little brush," which he repeatedly put in and out of her vagina. Dr. Yunez "put his tongue around [P.S's] vagina and then he introduced the tongue inside the vagina and then he asked [in Spanish] did you like it?" P.S. responded "no, you're my doctor." Dr. Yunez stood up, leaned over P.S., and put his hand over her mouth and told her not to say anything. The doctor was so close that P.S. felt his penis on her leg.

¶ 16    Yolanda took P.S. to the Chicago Police Department (CPD) to report the incident. P.S. was then taken to the hospital to undergo a sexual assault examination.

¶ 17    Tianna Price, an emergency room nurse at Advocate Trinity Hospital, testified that she examined P.S. and noted that she was anxious and nervous. Nurse Price administered a sexual assault kit and collected the underwear P.S. was wearing at the time of the incident. P.S. told the nurse that when Dr. Yunez first came into the examination room he was accompanied by his medical assistant, but that the medical assistant soon left the room, leaving her alone with the doctor. Dr. Yunez commented on the personality differences between P.S. and her twin sister C.S.,

4

expressing that P.S. was more approachable than her sister. P.S. thought that the doctor's comments were "odd."

¶ 18     P.S. said that during the examination, Dr. Yunez inserted his fingers into her vagina and asked her if she liked it. The doctor then kissed the outside of her vagina. When the doctor left the examination room, P.S. texted her sister C.S. Nurse Price acknowledged that the only type of vaginal penetration P.S. mentioned was digital penetration. The incident was reported to DCFS for investigation.

¶ 19     DCFS investigator Aracely Madrigal was assigned to P.S.'s case. Madrigal testified that she interviewed both P.S. and C.S. at their home. P.S. shared details about the sexual abuse. Madrigal then spoke with C.S. who stated that while she was waiting for P.S. to finish being examined by Dr. Yunez, she received a text message from P.S. leading her to believe that P.S. was upset about something. When C.S. saw P.S., she was pale and exclaimed that she was never going back to that doctor. On the way home, P.S. appeared upset and was unusually quiet. Their mother asked P.S. in a joking manner if the doctor had told P.S. she was going to die. Later that evening, P.S. told C.S. and their mother about the sexual abuse. P.S. said that Dr. Yunez "made her feel on him" and asked if she liked it. The doctor kissed her vagina and told her that he could tell she was easy and that C.S. was feisty.

¶ 20     Madrigal consulted with her supervisor and they determined that P.S. and C.S.'s statements were credible. In addition, DNA testing of P.S.'s underwear tested positive for the presence of male saliva. As a result, Dr. Yunez was indicated for sexual penetration of P.S., and for substantial risk of sexual injury to C.S. Madrigal acknowledged that she never received the final DNA results from the detective assigned to the pending criminal investigation, as she had already closed her investigation.

¶ 21    The allegations of sexual assault made against Dr. Yunez were initially investigated by the CPD, but the case was transferred to the Melrose Park Police Department after it was determined that the incident occurred outside the city's jurisdiction. Detective Dennis Natale of the Melrose Park Police Department was assigned to investigate the allegations.

¶ 22    Detective Natale testified that on May 23, 2019, he attended both girls' respective forensic interviews, which were recorded on DVDs. The detective determined that the statements were "mostly consistent," with the only inconsistency being P.S. stating that Dr. Yunez pressed his penis against her leg, while C.S. stated that the doctor asked P.S. to touch his penis.

¶ 23    Following the forensic interviews, Detective Natale spoke with Dr. Yunez on two separate occasions at his medical office. The doctor related that his medical assistant, Edna Perez, was in the examination room with him the entire time he examined P.S.

¶ 24    Detective Natale then spoke with Perez on two separate occasions, the last conversation occurring at the State's Attorney's office. Perez claimed she was in the examination room with Dr. Yunez the entire time, except for a period of approximately ten minutes when she left the room. During this brief period, Perez did not know the doctor's location within the office.

¶ 25    Karen Abbinanti, a forensic scientist with the Illinois state crime lab, informed Detective Natale that the results of the DNA analysis were "inconclusive." Abbinanti explained that the DNA recovered from P.S.'s underwear "belonged to three separate males," but the lab was "unable to determine who through comparison." The detective shared this information with DCFS, and advised the agency that the criminal investigation was ongoing. In March 2020, the Cook County State's Attorney declined to file criminal charges against Dr. Yunez. The detective testified that based on the information in his possession, he was unable to form an opinion as to whether Dr. Yunez had sexually abused P.S., characterizing the case as "very difficult."

¶ 26    Perez testified that she prepared P.S. for her examination with Dr. Yunez. The exam was conducted in Spanish. Perez took P.S.'s vital signs and then instructed her to undress from the waist down and put on a hospital gown. Perez left the room while P.S. changed into the hospital gown. After about five minutes, Perez returned to the examination room with Dr. Yunez.

¶ 27    Perez testified that she observed Dr. Yunez perform P.S.'s exam. P.S. complained of pain in her pelvic area. Dr. Yunez was concerned that P.S. might be suffering from pelvic inflammatory disease caused by an IUD. As a result, Dr. Yunez performed a "bimanual exam," where he inserted one finger into P.S.'s vagina and pressed down on her stomach with his other hand, while asking her "esta bien? esta bien?" According to Perez, Dr. Yunez was not asking P.S. if what he was doing felt good to her, but rather was asking if what he was doing was causing her any pain. Dr. Yunez ultimately determined that the source of P.S.'s pain was a pelvic ligament injury she probably suffered while playing soccer.

¶ 28    Perez testified that during Dr. Yunez's gynecological examination of P.S. she never saw the doctor touch P.S.'s vagina in any way that was medically unnecessary. Perez claimed she never saw the doctor kiss or lick P.S.'s vagina and never heard him make any sexually suggestive remarks.

¶ 29    As to the ten-minute period after Perez claimed she left the examination room and was unable to account for Dr. Yunez's whereabouts, she now remembered that the doctor was in the lab area preparing a shot to give P.S. in her foot. Perez observed Dr. Yunez prepare the shot and was in the examination room when it was administered.

¶ 30    Perez noted that when she and Dr. Yunez returned to the examination room to give P.S. the shot, she "found it odd" that P.S. had not gotten dressed as earlier instructed and that P.S.'s twin sister C.S., was now in the examination room. Perez acknowledged that she was a mandatory

reporter and claimed that if she had observed "anything that was going on there that was of a sexual nature," she would have reported it.

¶ 31    Dr. Yunez testified that on May 13, 2019, P.S. appeared at his medical office complaining of pain in her pelvic area and vaginal discharge. She also complained of a foot injury. The doctor was concerned about the pelvic pain because P.S. had previously been fitted with an IUD and there was a concern that it was causing an infection, which could lead to infertility.

¶ 32    Dr. Yunez stated that when he entered the examination room to evaluate and treat P.S., his medical assistant Edna Perez always accompanied him. Initially, he examined P.S.'s vagina using a speculum and performed a so-called "sniff test" on her vaginal secretions to determine if she was suffering from an infection which could be causing her pelvic pain. The "sniff test" failed to identify an infection.

¶ 33    P.S.'s pelvic pain was caused by an injury to her pelvic ligament according to Dr. Yunez and had "nothing to do with the IUD." He was able to determine the source of the pain by inserting his gloved fingers into P.S.'s vagina for a couple of seconds whereupon she "jumped" and experienced "cervical motion tenderness." Dr. Yunez stated that if the digital examination had not uncovered the source of P.S.'s pelvic pain, the next step would have been to schedule an ultrasound.

¶ 34    Dr. Yunez maintained that he was never alone with P.S., never touched her vagina or private area in an inappropriate way, never licked or kissed her vagina, never stood so close to her that his penis touched her leg, and never asked her if she liked the digital penetration. The doctor claimed that the only thing he said to P.S. which she could have construed as being sexual in nature is when, during her pelvic examination, he asked her in Spanish whether she was experiencing any pain, asking "si siento bien," which could be translated as "if it feels okay." The doctor could not

recall C.S. being in the examination room with P.S. when he and Perez returned to the room to administer the cortisone injection into P.S.'s foot.

¶ 35                      B. Recommendation of the Administrative Law Judge

¶ 36    On March 9, 2021, the ALJ issued an opinion recommending the DCFS director deny Dr. Yunez's request to expunge the indicated findings from the state central register. Following a detailed recitation of the findings of facts, the ALJ determined that P.S., C.S., and their mother Yolanda, were more credible than Dr. Yunez and Perez.

¶ 37    The ALJ noted that P.S. provided a detailed account of the doctor's conduct. The ALJ found that the recorded statements were consistent in that both P.S. and C.S. stated that when they were being examined by Dr. Yunez, his medical assistant Perez was not in the examination room. In addition, the ALJ determined that their statements were consistent regarding the fact that P.S. sent C.S. a text message asking C.S. to come to her examination room. The ALJ also found that C.S. and Yolanda provided consistent and detailed accounts of P.S.'s demeanor immediately after Dr. Yunez examined her.

¶ 38    In contrast, the ALJ assessed that Dr. Yunez's credibility was weakened because he "testified in generalities and deflections that negatively affected his credibility." The doctor "did not directly answer what happened [to P.S.]." Instead, he attempted to infer that Perez must have been in the examination room with him when he examined P.S., because he had a general practice of always being accompanied by a nurse when he examined a patient. The ALJ concluded that the doctor's testimony was unreliable when weighed against the very detailed statements of P.S. and C.S., and Yolanda's testimony.

¶ 39    As to Perez, the ALJ determined that her testimony suffered from the same credibility defects as Dr. Yunez's testimony. Perez's testimony was "inconsistent and unreliable" in that she

testified to the general practice of Dr. Yunez never being alone with a patient. The ALJ also reasoned that Perez was financially motivated to protect the doctor from having his medical practice closed. The ALJ concluded that a preponderance of the evidence supported the indicated finding against Dr. Yunez and accordingly recommended that the DCFS director deny the doctor's request to expunge the indicated report.

¶ 40                          C. DCFS Director's Final Decision

¶ 41    On March 19, 2021, the acting director of DCFS issued a final administrative decision adopting the ALJ's factual findings and legal conclusions. Dr. Yunez's request for expungement of the indicated findings was denied.[1]

¶ 42                               D. Circuit Court Decision

¶ 43    Dr. Yunez filed a complaint for administrative review in the circuit court on April 19, 2021, seeking reversal of the acting director's final decision. The circuit court reviewed the complaint, administrative record and the parties' memoranda, and after oral argument, entered an order affirming the acting director's final decision. This appeal followed.

¶ 44                                    II. ANALYSIS

¶ 45    Dr. Yunez first argues that the ALJ erred in admitting the forensic interviews as their admission was conditioned on his opportunity to cross-exam and the opportunity to cross was never provided.

¶ 46    "In an appeal from an administrative agency's decision, we review the agency's determination, not that of the circuit court." *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 23. "An administrative agency's decision 'regarding the conduct of its hearings and the introduction of evidence is properly governed by an abuse of

_____

[1]DCFS eventually expunged the indicated finding of substantial risk of sexual injury to C.S. and therefore it is not an issue in this appeal.

discretion standard.' " *Alliance for the Greater Lakes v. Department of Natural Resources*, 2020 IL App (1st) 182587, ¶ 38 (quoting *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003)). "An abuse of discretion occurs only when no reasonable person would take the view adopted by the court." *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 34.

¶ 47    Initially, we find that Dr. Yunez forfeited any complaint that he was denied the opportunity to cross-examine P.S. and C.S. during the administrative hearings, where he failed to raise the issue at the hearings. "A party forfeits administrative review of issues and defenses not placed before the administrative agency." *Keeling v. Board of Trustees of the Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45.

¶ 48    A review of the record demonstrates that Dr. Yunez had the opportunity to object to the absence of cross-examination once it became apparent that DCFS would not be calling P.S. or her sister C.S. as witnesses. Dr. Yunez contends that he should be excused for not objecting to the lack of cross-examination because he "believed that the complainant would testify and be subject to cross-examination," since DCFS listed the complainant and her sister on its witness list. We disagree.

¶ 49    When it became apparent that DCFS was going to rely on P.S.'s and C.S.'s forensic interviews, rather than call them in person as witnesses, Dr. Yunez could have called them as witnesses during his case-in-chief. As the circuit court observed, "once it became apparent P.S. was not going to be called as a witness, it was incumbent upon Dr. Yunez to object and call her as a witness during his own case-in-chief."

¶ 50    Dr. Yunez was not denied the opportunity to cross-examine P.S. and C.S. The Sixth Amendment's confrontation clause is satisfied where the defense is given a full and fair opportunity to cross-examine the witnesses. *United States v. Owens*, 484 U.S. 554, 557-58 (1988).

11

Here, Dr. Yunez had the opportunity to request that P.S. and C.S. be made available for cross-examination, but he failed to avail himself of that opportunity. Again, as the circuit court observed:

"Dr. Yunez, who was represented by counsel, could have stopped the administrative proceedings when he realized P.S. and C.S. would not be called to testify. He could have asked that P.S. and/or C.S. be called to testify. He could have subpoenaed them. He could have made an objection to the admission of the forensic interviews and statements made by P.S. on the grounds there would be no cross examination. He did none of these things."

¶ 51 "Due process was not denied merely because [Dr. Yunez] did not fully exercise his right to cross-examination." *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 825 (2009). Dr. Yunez had the right to request that the ALJ subpoena P.S. and C.S. to testify at the administrative hearing. See 89 Ill. Adm. Code 336.105(b)(3)(A) (2017), which provides:

"A) Either party requesting that a child be subpoenaed to testify or be involved in the hearing process must demonstrate at the pre-hearing conference that:

i) the child's testimony or involvement is essential to a determination of an issue on appeal;

ii) the likelihood of inflicting emotional harm to the particular child involved can be minimized with conditions and restrictions and the child's testimony is necessary for the interests of justice; and

iii) no alternatives, such as stipulations or transcripts from prior court hearings, exist that may be used as a substitute for the child's testimony." 89 Ill. Adm. Code 336.105(b)(3)(A) (2017).

However, "[w]here a party has a right to subpoena witnesses, and he does not do so, he cannot later complain of the fact that he has been denied the right of confrontation of adverse witnesses and the right of cross-examination." *Diaz v. United States Postal Service*, 658 F. Supp. 484, 490

(1987).

¶ 52    Moreover, even assuming Dr. Yunez had not forfeited his claim that he was denied the opportunity to cross-examine the hearsay statements in the forensic interviews, we cannot conclude that the ALJ abused her discretion in admitting the statements.

¶ 53    Section 336.120(b)(1) of Title 89 of the Illinois Administration Code (Administrative Code) authorizes an ALJ to "conduct a fair, impartial and formal hearing in which the strict rules of evidence do not apply." 89 Ill. Adm. Code § 336.120(b)(1) (2017). The ALJ is permitted to "take necessary steps to develop a full and fair record that contains all relevant facts." 89 Ill. Adm. Code § 336.120(b)(6) (2017).

¶ 54    The Administrative Code allows into evidence "all inculpatory and exculpatory evidence helpful in determining whether an indicated perpetrator abused or neglected a child, including oral and written reports and the investigative file." 89 Ill. Adm. Code § 336.120(b)(9) (2017). Moreover, the Administrative Code specifically allows into evidence "previous statements made by the child relating to abuse or neglect as hearsay exceptions." 89 Ill. Adm. Code § 336.120(b)(10) (2017). In addition, section 10-40(a) of the Illinois Administrative Procedures Act (Procedure Act) provides that "[e]vidence not admissible under [the civil rules of evidence and privilege] may be admitted *** if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." 5 ILCS 100/10-40(a) (West 2020); see also 68 Ill. Adm. Code § 1110.220(a) (2018).

¶ 55    Under the facts of this case, we find that the above-cited statutes granted the ALJ the authority to admit the forensic interviews containing P.S.'s and C.S.'s hearsay statements, even in the absence of cross-examination. See, *e.g.*, *Funk v. Illinois Department of Children and Family Services*, 2023 IL App (3d) 220320-U, ¶¶ 26-28 (finding that the ALJ had the authority to admit investigative report containing children's hearsay statements, even absent cross-examination); see

also Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 56    Dr. Yunez finally argues that the decision to deny his request for expungement was against the manifest weight of the evidence. The doctor points to inconsistencies in P.S.'s statement, which he contends undermines its weight. He claims there was no physical evidence connecting him to the accusations and that the DNA evidence failed to corroborate P.S.'s allegations. He also contends that the ALJ failed to consider the interviews of several employees, other than Perez, who claimed they did not observe anything unusual.

¶ 57    Dr. Yunez's arguments essentially go to the weight of the evidence and the assessment of witness credibility, which were matters for the ALJ to resolve. "In raising these arguments, [Dr. Yunez] essentially asks us to substitute our judgment for that of the trier of fact by reweighing the evidence and drawing our own conclusion as to the credibility of the witnesses." *Plowman v. Department of Children and Family Services*, 2017 IL App (1st) 160860, ¶ 24. As a reviewing court, we may not reweigh the evidence, assess witness credibility, or resolve conflicts in testimony. *White v. Department of Employment Security*, 376 Ill. App. 3d 668, 671 (2007). "[I]t is the province of the administrative agency to determine the credibility of witnesses and resolve conflicts in the evidence." *Plowman*, *Id.*, ¶ 24.

¶ 58    Here, the ALJ stated that she "carefully reviewed" the statements contained in the respective forensic interviews and found them to be factually detailed and consistent, and corroborated by the testimony of Yolanda. In contrast, the ALJ determined that the testimonies of Dr. Yunez and Perez were inconsistent and unreliable when weighed against the detailed statements of P.S. and C.S., and the testimony of their mother.

¶ 59    In light of the deference given to credibility determinations and assessments of the proper

weight to be given to witness testimony by the trier of fact in cases where the welfare of children is involved, we cannot say that the decision to deny Dr. Yunez's request for expungement was against the manifest weight of the evidence.

¶ 60                                    III. CONCLUSION

¶ 61     Accordingly, we affirm the order of the circuit court which confirmed the decision of DCFS to deny Dr. Yunez's request to expunge the indicated finding of sexual penetration entered against him.

¶ 62     Affirmed.